# NATIONAL LABOR RELATIONS BOARD *v.* CROMPTON-HIGHLAND MILLS, INC.

No. 197.   Argued January 31, 1949.—Decided May 31, 1949.

*David P. Findling* argued the cause for petitioner. With him on the brief were *Solicitor General Perlman, Ruth Weyand* and *Bernard Dunau.*

*Ralph Williams* argued the cause for respondent. With him on the brief was *S. Y. Austin, Jr.*

MR. JUSTICE BURTON delivered the opinion of the Court.

In this case a collective bargaining representative was certified, under the National Labor Relations Act,[1] to represent all employees working in a certain appropriate bargaining unit. Their employer engaged in extended negotiations with this representative as to many matters, including rates of pay. December 19, 1945, the negotiations reached something of an impasse. The question here presented is whether this employer engaged in an unfair labor practice when, on January 1, 1946, it put into effect as of December 31, 1945, without prior consultation with the bargaining representative, a general increase in the rates of pay applicable to most of the employees who had been represented in the negotiations. This increase

---

[1] § 9 of the National Labor Relations Act, 49 Stat. 453, 29 U. S. C. (1940 ed.) § 159; *In the Matter of Crompton-Highland Mills,* 62 N. L. R. B. 1346.

was a substantially greater one than any which the employer had offered during the negotiations. For the reasons to be stated, we hold that, under the circumstances, this action constituted an unfair labor practice and that a decree should be entered enforcing an order prohibiting such conduct. The case also raises questions as to the nature of the impasse which was reached and as to the proper scope and terms of the enforcement decree.

August 13, 1945, the Textile Workers Union of America, Congress of Industrial Organizations, following an election under the statute, was certified as the exclusive collective bargaining representative for about 800 employees of Crompton-Highland Mills, respondent herein. These employees included most of its production and maintenance employees at Griffin, Georgia, where it manufactured cotton and other goods. Much of the material entering into those goods and most of the finished goods there produced were bought, sold or transported in interstate commerce, so that the unfair labor practice, if any, concededly affected such commerce. From August 31, 1945, at least until December 19, a committee of this union engaged in collective bargaining with the respondent on numerous appropriate subjects, including rates of pay. Many tentative agreements were reached.

January 1, 1946, without prior consultation with any member of the bargaining committee, the employer announced a general and substantial increase in the rates of pay of its employees, amounting to about two to six cents an hour, effective as of December 31, 1945. This increase applied to most, but not all, of the employees in the bargaining unit. Simultaneously with its posting of the announcement of this increase, the employer told the employee members of the bargaining committee about it. At the same time, the employer mailed an announcement of it to one of the two nonemployee members of the bargaining committee.

January 31, 1946, the National Labor Relations Board, petitioner herein, in response to charges made by the union, filed a complaint against the employer, alleging several unfair labor practices.[2]  These included the above-described increase in rates of pay.  After hearings before a trial examiner and consideration of that examiner's intermediate report, the employer's exceptions and brief relating to that report and the entire record and oral arguments, the Board, on August 21, 19, 6, issued a cease and desist order.  70 N. L. R. B. 206  The Court of Appeals for the Fifth Circuit denied a petition for enforcement.  167 F. 2d 662.  Because of the importance of the issue in the administration of the labor relations statutes, we granted certiorari.  335 U. S. 812.

The precise issue presented is what decree, if any, should be issued by the Court of Appeals for the enforcement of the order of the National Labor Relations Board.[3]  If a decree is to be issued, its scope and terms should be based upon such part, or all, of the Board's cease and desist order as is supported by its findings of fact.  Those findings are binding upon us to the extent that they are sustained by substantial evidence.[4]  We are satisfied

---

[2] Under §§ 7, 8 (1) and (5), and 10 of the Nationa Labor Relations Act, 49 Stat. 452–455, 29 U. S. C. (1940 ed.) §§ 157, 158 (1) and (5), and 160.

[3] For the Board's order, see Appendix A, *infra*, pp. 227–229.

[4] "The findings of the Board as to the facts, if supported by evidence, shall be conclusive."  § 10 (e) of the National Labor Relations Act, 49 Stat. 454, 29 U. S. C. (1940 ed.) § 160 (e).  "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."  § 10 (e), as amended by the Labor Management Relations Act, 1947, 61 Stat. 148, 29 U. S. C. (1946 ed., Supp. I) § 160 (e).

"We have repeatedly held that Congress, by providing, § 10 (c), (e) and (f), of the National Labor Relations Act, that the Board's findings 'as to the facts, if supported by evidence, shall be conclusive,' precludes the courts from weighing evidence in reviewing the Board's

that there is substantial evidence to support the material findings of fact made by the Board as to the issue before us and, therefore, see no need to set forth that evidence here. The primary issue for discussion is, rather, the extent to which the Board's findings of fact support its cease and desist order and justify a decree for the enforcement of that order.

The controlling specific findings of the Board are as follows:

> "As fully discussed in the Intermediate Report, the respondent, during the course of negotiations with the Union, refused to accede to the Union's wage demands and it was not until their last conference on December 19, 1945, that the respondent made its first and only counterproposal of approximately 1 to 1½ cents an hour raise, which the Union rejected. *Thereafter, the respondent made no further effort to settle the wage dispute but, instead, on January 1, 1946, only 12 days later, granted its employees a substantially larger increase than that previously offered to the Union, without consulting the Union or affording it an opportunity to negotiate with respect thereto.* In our opinion, such action taken as [so] soon after the Union was attempting through the bargaining process to reach an agreement with the respondent, among other things, on wages, clearly *shows that the respondent was not acting in good faith during the negotiations, and is manifestly in-*

orders, and if the findings of the Board are supported by evidence the courts are not free to set them aside, even though the Board could have drawn different inferences." *Labor Board* v. *Nevada Consolidated Copper Corp.*, 316 U. S. 105, 106–107.

See also, *Medo Photo Supply Corp.* v. *Labor Board,* 321 U. S. 678, 681, n. 1; *Consolidated Edison Co.* v. *Labor Board*, 305 U. S. 197 229; *Washington, V. & M. Coach Co.* v. *Labor Board*, 301 U. S. 142, 146–147.

*consistent with the principle of collective bargaining.*
Nor are we impressed with the respondent's attempted justification for its action on the ground that the Union broke off negotiations on December 19 and that the respondent was therefore relieved of the obligation to deal with it. *Concededly, the respondent never proposed to the Union as a possible basis of agreement a wage increase comparable to that granted on January 1, 1946.* Moreover, the record fails to support the respondent's contention that the Union's representatives assumed an unequivocal position at the last meeting which foreclosed further bargaining concerning wages or other terms or conditions of employment. Under these circumstances, *we find, as did the Trial Examiner, that the respondent, by its action with respect to the wage increase, failed to perform its statutory duty to bargain collectively with the Union and thereby interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in the Act.*" (Emphasis supplied.) 70 N. L. R. B. at pp. 206–207.[5]

---

[5] In addition to its own findings, quoted in the text, the Board adopted, in general terms, all of the findings of the trial examiner, with certain modifications and exceptions not here material. A number of such adopted findings, which are of significance in securing a full appreciation of the basis for the Board's order, are set forth in Appendix B, *infra*, pp. 230–234.

The increase in pay was explained by Herbert A. Pickford, manager of the respondent, as follows in his testimony before the trial examiner:

"Q. Mr. Pickford, explain why you made the wage increase on January 1, 1946.—A. We had heard the end of the previous week that numerous mills throughout the state had made wage adjustments, and we heard through rumor, more or less through the grape vine, that local mills were planning to make wage adjustments. I checked into that rumor with various mills and found that wage

I. *The employer engaged in an unfair labor practice when, without consulting the employees' collective bargaining representative, it put into effect, for most of its employees who had been represented in the bargaining negotiations, a general increase in rates of pay which was substantially greater than any that the employer had offered.*

The specific findings of the Board, coupled with the findings adopted by it from the trial examiner's report, leave no room for doubt as to the adequacy of the facts upon which its cease and desist order was based. For significant findings adopted from the examiner's report, see Appendix B, *infra*, pp. 230–234. The facts so found distinguish this case from any in which no collective bargaining representative has been certified or otherwise authorized to represent the employees in an appropriate unit.[6] In the instant case, the wish of the employees to

adjustments were going to be made, although I didn't get any specific dates as to when they would be made.

"We had steadfastly said throughout our bargaining conferences that if and when wage increases in our area were made, we would be amongst the first, as we had always been, to make such increases. And when we heard that wage increases were to take place, we wanted to maintain our position as being amongst the first to make the increase and also maintain our position in the local labor market by making an increase ourselves.

"Q. Do you know, Mr. Pickford, what wage increases were made by any of the other mills in Griffin?—A. I do not know the definite figures aside from what I saw in the paper.

"Q. Did you join with any mills in making any announcement about a wage increase?—A. No; we did not. We made our announcement independently of anyone else, as we have always done."

[6] "Sec. 8. It shall be an unfair labor practice for an employer—

.    .    .    .    .    .

"(5) To refuse to bargain collectively with the representatives of his employees, subject to the provisions of Section 9 (a)."  49

be consulted and to bargain collectively as to the terms
of any general wage increase is established by the findings
and the negotiations. Cf. *Labor Board* v. *Columbian
Enameling & Stamping Co.*, 306 U. S. 292, 297. We do
not have here a case where the bargaining had come to
a complete termination cutting off the outstanding in-
vitation of the certified collective bargaining representa-
tive to bargain as to any new issue on such a matter
as rates of pay. Cf. *Labor Board* v. *Sands Mfg. Co.*,
306 U. S. 332. The opening which a raise in pay makes
for the correction of existing inequities among employees
and for the possible substitution of shorter hours, va-
cations or sick leaves, in lieu of some part of the pro-
posed increase in pay, suggests the infinite opportunities
for bargaining that are inherent in an announced readi-
ness of an employer to increase generally the pay of its
employees. The occasion is so appropriate for collective
bargaining that it is difficult to infer an intent to cut off
the opportunity for bargaining and yet be consistent with
the purposes of the National Labor Relations Act.

We do not here have a unilateral grant of an increase
in pay made by an employer after the same proposal has
been made by the employer in the course of collective
bargaining but has been left unaccepted or even rejected
in those negotiations. Such a grant might well carry no
disparagement of the collective bargaining proceedings.
Instead of being regarded as an unfair labor practice, it

---

Stat. 452–453, and also in 61 Stat. 140–141, 29 U. S. C. (1946 ed.,
Supp. I) § 158.

"Sec. 9. (a) Representatives designated or selected for the purposes
of collective bargaining by the majority of the employees in a unit
appropriate for such purposes, shall be the exclusive representatives
of all the employees in such unit for the purposes of collective bar-
gaining in respect to rates of pay, wages, hours of employment, or
other conditions of employment: . . ." 49 Stat. 453, and also in
61 Stat. 143, 29 U. S. C. (1946 ed., Supp. I) § 159 (a).

might be welcomed by the bargaining representative, without prejudice to the rest of the negotiations. See *In the Matter of W. W. Cross & Co.*, 77 N. L. R. B. 1162; *In the Matter of Exposition Cotton Mills Co.*, 76 N. L. R. B. 1289; *In the Matter of Southern Prison Co.*, 46 N. L. R. B. 1268.

We hold that the Board's order to cease and desist is justified, under the circumstances of this case, to the extent that the order requires the employer to cease and desist from refusing to bargain collectively by taking action, without prior consultation with the authorized collective bargaining representative of the employees, with respect to general rates of pay which are substantially different from, or greater than, any which the employer has proposed during its negotiations with such representative. The need for this order depends in part upon the Board's finding that the action by the employer, on January 1, 1946, taken so soon after the meeting of December 19, 1945, showed that "the respondent [employer] was not acting in good faith during the negotiations, and is manifestly inconsistent with the principle of collective bargaining." 70 N. L. R. B. at p. 207. See *May Dept. Stores Co.* v. *Labor Board*, 326 U. S. 376; *Medo Photo Supply Corp.* v. *Labor Board*, 321 U. S. 678; *Labor Board* v. *Newark Morning Ledger Co.*, 120 F. 2d 262; *Jeffery-DeWitt Insulator Co.* v. *Labor Board*, 91 F. 2d 134.[7]

[7] Even though the employer, since January 1, 1946, may have carried on collective bargaining in good faith as to rates of pay and other matters, a decree enforcing the original order against making a general increase without consulting the collective bargaining representatives is justifiable. ". . . an order of the character made by the Board, lawful when made, does not become moot because it is obeyed or because changing circumstances indicate that the need for it may be less than when made." *Labor Board* v. *Pennsylvania Greyhound Lines*, 303 U. S. 261, 271. See also, *Federal Trade Comm'n* v. *Goodyear Tire & Rubber Co.*, 304 U. S. 257.

## II. *The decree of enforcement should not extend further than necessary to prevent the taking of the prohibited action by the employer.*

There are no findings by the Board that establish a lack of good faith or lack of consistency with the principle of collective bargaining on the part of the employer other than in the connection above discussed. The Board declined to uphold the trial examiner in his findings and recommendations as to several alleged unfair labor practices other than this one. The Board's own finding as to the employer's interference with, and restraint and coercion of, its employees is expressly limited to this one item. It reads:

> "Under these circumstances, we find, as did the Trial Examiner, that the respondent, *by its action with respect to the wage increase,* failed to perform its statutory duty to bargain collectively with the Union and *thereby* interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in the Act." (Emphasis supplied.) *Id.* at p. 207.

Accordingly, there appears no reason for enlarging the scope of the enforcement decree beyond that feature, and little, if any, need for orders requiring either specific affirmative action to be taken by the employer or the posting of any notices by it.[8]

---

[8] ". . . The breadth of the order, like the injunction of a court, must depend upon the circumstances of each case, the purpose being to prevent violations, the threat of which in the future is indicated because of their similarity or relation to those unlawful acts which the Board has found to have been committed by the employer in the past. . . . We hold only that the National Labor Relations Act does not give the Board an authority, which courts cannot rightly exercise, to enjoin violations of all the provisions of the statute merely because the violation of one has been found. To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger

For these reasons, the judgment is reversed and the cause is remanded to the Court of Appeals for action consistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS, MR. JUSTICE MURPHY and MR. JUSTICE RUTLEDGE join in Part I of this opinion, but think the Board's order should be enforced without modification.

## APPENDIX A.

Order of National Labor Relations Board *In the Matter of Crompton-Highland Mills, Inc., and Textile Workers Union of America, CIO,* Case No. 10–C–1812.—Decided August 21, 1946.

### "ORDER

"Upon the entire record in the case, and pursuant to Section 10 (c) of the National Labor Relations Act, the National Labor Relations Board hereby orders that the respondent, Crompton-Highland Mills, Inc., Griffin, Georgia, and its officers, agents, successors and assigns shall:

"1. Cease and desist from:

"(a) Refusing to bargain collectively with Textile Workers Union of America, CIO, as the exclusive representative of the respondent's production and maintenance employees at the Griffin plant, including watchmen, but excluding office, clerical, technical, and laboratory employees, section men in the spinning room, head loom

---

of their commission in the future is to be anticipated from the course of his conduct in the past. That justification is lacking here." *Labor Board* v. *Express Pub. Co.,* 312 U. S. 426, 436–437, and see pp. 438–439.

See also, *May Dept. Stores Co.* v. *Labor Board,* 326 U. S. 376, 392–393; *J. I. Case Co.* v. *Labor Board,* 321 U. S. 332, 341–342.

fixers in the weave room, head fixers in the card room, all supervisory employees of the grade of second hand and above, and all other supervisory employees with authority to hire, promote, discharge, discipline, or otherwise effect changes in the status of employees, or effectively recommend such action, by taking action, without prior consultation with said organization, with respect to rates of pay, wages, hours of employment, and other conditions of employment.

"(b) In any manner interfering with the efforts of Textile Workers Union of America, CIO, to bargain collectively with it as the representative of its employees in the appropriate unit described above.

"2. Take the following affirmative action, which the Board finds will effectuate the policies of the Act:

"(a) Upon request, bargain collectively with Textile Workers Union of America, CIO, as the exclusive representative of all its employees in the appropriate unit described above with respect to rates of pay, wages, hours of employment, and other conditions of employment;

"(b) Post at its plant at Griffin, Georgia, copies of the notice attached hereto, marked 'Appendix A.' Copies of such notice, to be furnished by the Regional Director for the Tenth Region, shall, after being duly signed by the respondent's representative, be posted by the respondent immediately upon receipt thereof, and maintained by it for sixty (60) consecutive days thereafter, in conspicuous places, including all places where notices to employees are customarily posted. Reasonable steps shall b, taken by the respondent to insure that said notices are not altered, defaced, or covered by any other material;

"(c) Notify the Regional Director for the Tenth Region (Atlanta, Georgia), in writing, within ten (10) days from the date of this Order, what steps the respondent has taken to comply herewith." 70 N. L. R. B. at pp. 208–209.

"Appendix A

"Notice to All Employees

"Pursuant to a Decision and Order of the National Labor Relations Board, and in order to effectuate the policies of the National Labor Relations Act, we hereby notify our employees that:

"We will bargain collectively with Textile Workers Union of America, CIO, as the exclusive representative of all employees in the bargaining unit described below, with respect to rates of pay, wages, hours of employment, and other conditions of employment.

"We will not make any changes with respect to rates of pay, wages, hours of employment, or other conditions of employment of our employees in the bargaining unit described below, without prior consultation with Textile Workers Union of America, CIO.

"We will not in any manner interfere with the efforts of Textile Workers Union of America, CIO, as the exclusive representative of our employees in the unit described below, to bargain collectively with us.

"The bargaining unit is: All production and maintenance employees at our Griffin plant, including watchmen, but excluding office, clerical, technical and laboratory employees; section men in the spinning room, head loom fixers in the weave room, head fixers in the card room, all supervisory employees of the grade of second hand and above, and all other supervisory employees with authority to hire, promote, discharge, discipline, or otherwise effect changes in the status of employees, or effectively recommend such action.

"Crompton-Highland Mills, Inc.

"By ........................

"Dated ............    (REPRESENTATIVE.)    (TITLE.)

"This notice must remain posted for 60 days from the date hereof, and must not be altered, defaced, or covered by any other material." *Id.* at pp. 210–211.

## APPENDIX B.

Quotations from the "FINDINGS OF FACT" as to—"III. THE
UNFAIR LABOR PRACTICES, A. *The refusal to bargain"*
as stated in the Intermediate Report of the Trial Ex-
aminer, adopted by the National Labor Relations
Board and printed by the Board following its Decision
and Order.

"No further conference was held until December 19, when
a meeting was held at the request of the Union.

"The issues upon which the parties were still in dis-
agreement at this time involved wages, work assignments,
insurance provisions, severance pay, vacations, union se-
curity, arbitration, union activity upon company time,
and the preamble of the contract, in which the respondent
sought to define the parties to the agreement as the
respondent and the 'employees' in the appropriate unit,
as opposed to the Union's position that the Union be de-
nominated as party to the contract. On the issue of
union security, although the Union had offered to com-
promise for maintenance of membership, the respondent
refused to grant any form of security. As to wages,
although it had originally rejected the Union's proposals
for any wage increase, it proposed what amounted to an
increase of about one or one and one-half cents per hour
at this time.

"On January 1, 1946, the members of the union negoti-
ation committee, employed at the plant, were summoned
to the office of Plant Manager Pickford and informed that
the respondent was granting a general wage increase to
all employees,[18] amounting to about 2 to 6 cents per hour.

---

"[18] As will be seen, certain employees were not included in the wage
increase."

Pickford read to the committee the following letter under that date, addressed to Union Director Douty:

> "In the course of our extended contract negotiations we have repeatedly told you that our mill would be among the first to make wage adjustments in this locality. We have learned that certain of the mills in this locality are about to adjust their wages and we are, therefore, making comparable adjustments in our wage rates effective Monday, December 31st, 1945. A copy of the notice which has been posted in the mill today outlining the various rate adjustments is attached hereto.

"Attached to the letter were notices directed to the respective departments listing the various wage increases. The letter was received by Douty the next day. While the negotiating committee was in Pickford's office, copies of the notices announcing the wage increases were being posted on the bulletin boards in the respective departments.

"It will be seen from the foregoing that neither the Union nor the negotiating committee was consulted from December 19, the date of the last conference, to January 1, 1946, the date of the granting of the wage increase. Nor was the committee consulted on the latter date. The respondent merely presented it with a *fait accompli,* without affording the Union an opportunity to negotiate with respect to the amount of the increase, the employees to whom the increase would be applicable,[19] the effective date of the increase or any of the factors normally envisaged in the collective bargaining process.

---

"[19] The increase did not affect janitors, sweepers, scrubbers, outside help, and various other categories of employees included in the unit represented by the Union."

"It cannot be disputed, nor does the respondent deny, that the granting of the wage increase at that time, constituted unilateral action. . . .

"While it is evident that the Union was insistent in its demand for some form of union security during its negotiations with the respondent, the preponderance of the credible evidence does not support the respondent's position that the Union had, in effect, presented an ultimatum that no contract would be consummated which did not afford union security. As has already been indicated, union security was only one of several matters, aside from the wage question, upon which agreement had not yet been reached. If, as the respondent contends, it had left no doubt as to its position on the issue of union security in the conferences of October 17 and 18, and it was convinced that the Union was adamant on this issue, it seems unlikely that the parties would have conferred on November 7 and 8, and again on December 19, when the Union submitted a written wage proposal.

"It is clear, therefore, and the undersigned finds, that, although the parties had reached a temporary impasse on December 19 on some issues, principally wages, union security, and check-off, there is no substantial basis for concluding that the Union had abandoned negotiations at this time. · Moreover, even if the parties had reached an impasse in their negotiations, this obviously could not affect the Union's status as majority representative. The principle that 'a bargaining relationship once rightly established must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed,' is well-established.[20] Equally ·clear is the proposition that the granting of a unilateral wage increase

---

"[20] See *Franks Bros. Co.* v. *N. L. R. B.*, 321 U. S. 702, 705."

or other concession by an employer to his employees while the designated union is attempting to bargain concerning the same subject matter, constitutes a violation of the employer's duty to bargain with the union.[21] It is not a question, contrary to the respondent's argument, of giving the Union credit for a wage increase which it did not obtain, but rather of the conduct of the respondent in granting the increase in derogation of the Union's status as statutory representative, by depriving the Union of its right to bargain with respect to such increase.

.        .        .        .        .

"Upon the basis of the foregoing, and upon the entire record, the undersigned concludes and further finds that, by failing and refusing to furnish· the Union with essential and pertinent information relating to the respondent's wage structure under its 'point plan,' job specifications, work assignments, and information appertaining thereto, *and by granting its employees a unilateral wage increase on January 1, 1946, the respondent has from August 31, 1945, to December 19, 1945, and thereafter to date, including January 1, 1946, failed and refused to bargain with the Union as the exclusive collective bargaining representative of the employees in the appropriate unit above described, and has thereby interfered with, restrained, and coerced its employees in the exercise. of the rights guaranteed under* the Act." (Emphasis in this paragraph is supplied.) 70 N. L. R. B. at pp. 220–221, 222, 223–224.

---

"[21] See *Aluminum Ore Company* v. *N. L. R. B.*, 131 F. (2d) 485, 487, (C. C. A. 7), enf'g. 39 N. L. R. B. 1286, 1295–1299; *May.Department Stores* v. *N. L. R. B.*, 326 U. S. 376. See also, *Majority Rule in Collective Bargaining*, by Ruth Weyand, Columbia Law Review, Vol. XLV, 579–583, and footnotes at 581, for an excellent discussion and citation of authority on, *The Power of a Statutory Representative to Bar Unilateral Changes by Employer.*"

The Board left no doubt that it relied *solely* on the granting of the wage increase, when it issued its decision and order in this case. This appears from the following express statement in the Board's decision and order:

"1. The Trial Examiner found that the respondent, in violation of Section 8 (1) and (5) of the Act, failed to bargain collectively with the Union as the statutory representative of the respondent's employees by refusing to furnish the Union with certain detailed information relating to the incentive wage plan *and by granting a wage increase to its employees without consulting the Union. Although we agree with the Trial Examiner's conclusion, we, however, rest our determination solely on the latter ground.*" (Emphasis supplied.) *Id.* at p. 206.