NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

INTRACOASTAL TERMINAL, INC., and
Louisiana Processing Co., Inc.,
Respondents.

No. 18329.

United States Court of Appeals
Fifth Circuit.

Feb. 24, 1961.

Elliott Moore, Atty., Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Stuart Rothman, Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner.

Henry J. Read, New Orleans, La., Montgomery, Barnett, Brown & Read, New Orleans, La., of counsel, for respondents.

Before TUTTLE, Chief Judge, JONES, Circuit Judge, and MIZE, District Judge.

TUTTLE, Chief Judge.

This case is before the court on the petition of the National Labor Relations Board for enforcement of its order against the respondents. The order is reported at 125 N.L.R.B. 31. Essentially the basic facts are not in dispute. The following recitation of them is taken from the findings of fact made by the trial examiner and approved by the Board.

"Intracoastal Terminal, Inc. and Louisiana Processing Company, Inc. are a single employer within the meaning of the Act. The former corporation is engaged at its plant at Harvey, Louisiana, in receiving, storing and shipping oil field materials which are owned by its customers. The processing company, which is no longer in business, was engaged in grinding and processing barium sulphate at its plant which adjoined the plant of Intracoastal. Although each Respondent is a separate legal entity, they have identical officers, their stock is owned by the same persons, and their labor relations and overall policies were determined by the same individual. (p. 36).

*   *   *   *   *   *

"On August 26, 1957, while petitions (for election) were pending before the Board * * * the Respondents posted a notice to employees, saying that complaints had been received from the Negro employees, that a meeting of all employees had been held, and that as a result the Respondents confirmed their policy of 'preventing as far as possible discrimination against the colored employees on the basis of color alone.' The notice announced that effective immediately all employees would be eligible for bonuses on the same basis and that employees would be upgraded on the basis of ability, without regard to race * * *. The notice contained a third provision, as follows, which was not fulfilled:

"Effective January 1, 1958, all employees, regardless of race, will be entitled to two weeks vacation after one year of continuous service.

"During 1957 white employees who had been at work for a year were entitled to a paid vacation of 2 weeks. Negro employees of like service were entitled to 1 week's paid vacation. Thus, the effect of the new vacation policy, had it been carried out, would have been to double the vacation periods of eligible Negro employees.

"On the day that the above notice was posted, the Board issued its Decision and Direction of Election in the representation cases. On September 24, 1957, an election was held. Of 62 votes cast, 43 were in favor of the Union. There is no allegation or evidence that the Respondents' announced intent to end racial discrimination in employment was motivated by a desire to cause the Union's defeat in the election. Instead, as the Respondents said, they were motivated by the Negroes' complaints against the unequal working conditions.

"On October 2, 1957, the Board certified the Union. During the remainder of the year, representatives of the Respondents and the Union met in eight bargaining sessions. Proposals and counterproposals were exchanged, discussions took place, but an agreement was not reached. On January 10, 1958, the ninth session occurred. It too was unfruitful and later that day the Respondents wrote to the Union, saying:

"Dear Mr. Rogers:

"This letter is being dictated immediately following your departure from my office on Friday, January 10, after the meeting between you and your Committee and Mr. Gene Hooper, Jr., John Hooper and myself.

"In order to obviate the possibility of any misunderstanding as to the relative positions of the parties at this juncture in the negotiations, I would like to re-state in this letter the position of the Company as of today.

"I stated at the outset of today's meeting and re-state now, that the position of the Company and the position of the Union has been clearly developed and stated in the eight previous negotiation sessions. I stated that at the last meeting, which was held on December 17, the position of each party seemed to me solidified and that no progress whatsoever had been made in that last meeting. I stated that it seemed to me that possibly the parties had reached a state of impasse and that if you, as the Union representative, agreed, I saw no purpose in doing a vain and useless thing in continuing the negotiations. I added, however, that I was not stating that an impasse had been reached, but, rather suggesting that possibility, and I added further my complete willingness and that of the Company to continue with the negotiations. This letter is being written so that there will be misunderstanding (sic) between us on this point.

"Finally, I want to re-state the Company's willingness to sign a contract embodying those areas of agreement already reached in the negotiations. Alternatively, you may be assured of the Company's willingness to conduct further negotiations upon request with the hope that further progress can be made.

> "Yours very truly,
> "Montgomery, Barnett,
> "Brown & Read
> "By ..................
>   "Henry J. Read"

\*     \*     \*     \*     \*     \*

"The Union did not respond to that letter and there was no further written communication between the Respondents and the Union until July, 1958, as described below. \* \* \*

"During 1957 and earlier, the Respondents were open for business 24 hours a day. Work was so plentiful that sometimes employees were afforded opportunities to work a 7-day week with overtime pay above 40 hours. During early 1958, however, the volume of business decreased substantially. Adjustments became necessary. The General Counsel asserts that about March the Respondents unilaterally changed the work schedules of employees and deprived them of overtime pay for work on weekends. According to the General Counsel, the regular workweek had been Monday through Friday, with overtime pay for work in excess of 40 hours, but the work schedules were changed so that employees were laid off on Mondays and Tuesdays and were required to work on Wednesdays through Sundays without any overtime pay. \* \* \* The record does not warrant a finding that the adjustment affected every employee in the same manner. \* \* \* (The) president of the Respondents, testified that economic conditions made it necessary to lay off some employees and to eliminate overtime work, and that an effort was made to divide the available work among the remaining employees so that each would receive 40 hours at his regular rate of pay. \* \* \* Some employees continued to work on Mondays through Fridays as theretofore; the employees who did not work on Mondays and Tuesdays were afforded work on Saturdays and Sundays, and the Respondents continued to pay overtime rates to employees who worked more than 40 hours during a week. \* \* \* Respondents' places of business were open around-the-clock, and in their brief they say:

"The services which respondents furnish their customers require that

a work force be available seven days a week * * * with the slowdown in respondents volume of business, the available work was spread out among all of the employees so that each would have, to the full extent possible, at least forty hours a week. This required that some employees work on Saturday and/or Sunday at straight time rates without overtime * * *

"The record is clear that the reduction in overtime work and the change in the regular days of work for some employees were made by the Respondents unilaterally, without notice to the Union or opportunity to it to discuss the matter * * *

"About May 30, 1958, without notice to the Union, Louisiana Processing Company went out of business * * * The bargaining unit was composed of employees of both Respondents. Some employees who had worked for the processing company were transferred to the payroll of the other Respondent and continued at work. About six employees, who had the least seniority among employees in the unit, were laid off.

"Prior to the Board's Decision and Direction of Election above mentioned, each Respondent had maintained a separate payroll and, according to Hooper, had treated the employees 'as two separate units.' During negotiations in 1957 following the Board's Decision, as the Respondents say in their brief, they 'proposed a seniority provision which reflected the two companies as separate departments. * * * (but) The union's proposal, on the other hand, was for a single seniority list.' Neither party would agree to the other's proposal and the seniority issue was not resolved. Later, when layoffs occurred with the processing company's termination of business, they were consistent with the proposal which the Union had made that layoffs be according to low seniority in the single bargaining unit.

"* * * During 1958, the white and colored employees received unequal vacations as in past years. The Respondents made no written or oral announcement that the vacation provision of the notice of August 1957 was being rescinded. The Respondents simply kept silent and it was not until the summer of 1958, when vacations were being scheduled, that the Negro employees learned that they would not receive vacations of 2 weeks. The record does not disclose the date of the Respondents' decision to repudiate the vacation provision of the notice of August 1957. Hooper, their president, testified that the Board's Direction of Election was received after the notice was posted, that he understood that any change in working conditions, whether to the employees' benefit or detriment, 'would be looked upon in the same light as some intimidation or some act of reprisal,' and that 'rather than get involved in a situation where we could be charged with trying to entice (the employees) in the election,' the Respondents decided not to carry out the new vacation policy. The quoted testimony indicates that the decision to continue a racially discriminatory vacation policy was made before the election."

The Board found that the decision of the company to rescind its vacation policy for Negro employees "was made sometime after the election," and that such decision was discriminatory in violation of Section 8(a) (3), as well as a refusal to bargain in violation of Section 8(a) (5). 29 U.S.C.A. § 158(a) (3, 5).

The Board charges that the changing of hours of work touching on the Saturday and Sunday schedules and the discontinuance of the smaller company's operation (merging it with the larger) were violations of Section 8(a) (5) and (1) of the Act.

The Board's basis for concluding that the rearrangement of the work schedules without consultation with the Union and the closing of the smaller plant, even though required by the economic conditions facing respondents, were violations of Sections 8(a) (5) and (1) was that negotiations had not reached an impasse and therefore under the recognized authorities, May Department Stores v. N. L. R. B., 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145; N. L. R. B. v. Crompton-Highland Mills, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320, these actions interfered with the right of self organization by emphasizing to the employees that there was no necessity for a collective bargaining agent.

The respondent contends on the other hand that such changes as were made fell within the normal "rights of management" provisions of an employment contract; that such a clause was sought to be negotiated by the parties before bargaining broke down and that there had been a real impasse, following which the company was at liberty to put into effect changes that were within the contractual terms previously offered by it. See N. L. R. B. v. Crompton-Highland Mills, supra, 337 U.S. at page 224, 69 S. Ct. at page 963.

This, of course makes it necessary for us to consider whether the Board's finding that there was no impasse was supported by substantial evidence on the record as a whole. We conclude that this finding is not so supported. While properly stating that respondents were not shutting the door to any further proposals or offers to negotiate, the respondents by their letter of January 10 and the Union by its conduct in not attempting further negotiations until more than six months had elapsed, brought about a true impasse. It can hardly be expected that when both parties had concluded that there was no further reasonable prospect of reaching agreement, following eight genuine collective bargaining sessions, the company should thereafter be prevented from putting into effect such modifications of its employee relationships as were reasonably comprehended within its earlier proposals.

■ We conclude, therefore, that neither the rearrangement of time schedules to provide a 40-hour week for each employee, rather than dropping some employees and permitting others to make overtime for hours in excess of 40 hours per week, nor the merging of the two operations was an unfair labor practice or a violation of Section 8(a) (5) or Section 8(a) (1) of the Act.

■ The next question is whether the unilateral cancellation by the respondents of their announced policy to give the Negro employees an additional week's vacation to correspond with that granted the white employees was a violation of Sections 8(a) (3) or Section 8(a) (1).

We find no basis for a conclusion that the change of order as to the vacation period was a violation of Section 8(a) (3) which, of course, prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment *to encourage or discourage membership in any labor organization.*" (Emphasis supplied.)

In Radio Officers Union v. N. L. R. B., 347 U.S. 17, at page 43, 74 S.Ct. 323, 337, 98 L.Ed. 455, the Supreme Court made clear what should be apparent from the language of the Act itself. That is, "only such discrimination as encourages or discourages membership in a labor organization is proscribed". When it comes to the proof of motive, we agree with the statement recently made by the Court of Appeals for the Ninth Circuit in Pittsburgh-Des Moines Steel Co. v. N. L. R. B., 284 F.2d 74, where, on page 82, it was said:

"The conclusive presumption of intent set out in Radio Officers' is dependent on two prerequisites. First, the encouragement or discouragement of union membership must be a natural and foreseeable consequence of the employer's discrimination. And second, the discrimination itself *must* be based

solely upon the criterion of union membership. This second prerequisite is, we think, of the utmost importance."

Since it does not appear that there was any knowledge on behalf of the company as to the status of the Negro or white employees touching on Union membership, the Board could not possibly infer that the discrimination against the Negro employees was designed "to encourage or discourage membership in the Union." So far as the record shows, the Negro employees who were discriminated against may all have been non-union employees.

■ With respect to Section 8(a) (1), however, we agree with the Board that this unilateral change in policy touching on vacation time for a group of employees was not within the area of negotiations during the bargaining sessions and was therefore not a permissible activity even following the impasse. It was not suggested at any time during the bargaining sessions that the Negro employees would be treated differently with respect to vacation privileges than the other employees. The change in working conditions thereafter unilaterally instituted was not permissible under the Rule laid down by this court in N. L. R. B. v. J. H. Rutter-Rex Manufacturing Co., 5 Cir., 245 F.2d 594.

The petition of the Board for enforcement of the order is granted to the extent that it orders that the Respondents shall cease and desist from "changing vacation rights of employees without first consulting the Union", and to the extent that it requires the following affirmative action: respondents shall "make whole their Negro employees in the manner set forth in the action of the intermediate report entitled, 'the remedy', for any loss of paid vacations they suffered by reason of the respondents' discrimination against them."

In all other respects, enforcement will be

Denied.