**NATIONAL LABOR RELATIONS BOARD, Petitioner-Cross Respondent,**

v.

**J. H. BONCK COMPANY, Inc. and Louisiana Garment Manufacturing Company, Respondents-Cross Petitioners.**

No. 27403

Summary Calendar.

United States Court of Appeals, Fifth Circuit.

April 21, 1970.

Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Bd., Washington, D. C., John F. Le-Bus, Director, Region 15, N.L.R.B., New Orleans, La., for petitioner-cross respondent.

Daniel Lund, Henry J. Read, New Orleans, La., for respondents-cross petitioners.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

GEWIN, Circuit Judge.

This case comes to us on the petition of the National Labor Relations Board for enforcement of its order issued against J. H. Bonck Company, Inc. (Bonck), and Louisiana Garment Manufacturing Co. (Louisiana Garment).[1] The Employers filed a cross-petition seeking review.[2] The Board found the Employers had violated Sections 8(a) (5) and 8(a) (1) of the Labor-Management Relations Act[3] by: unilaterally granting wage increases to their employees; urging employees to deal directly with their employer; soliciting striking employees to abandon the strike and the Union accompanied by threats and offers of increased wages. The Board found Louisiana Garment had violated Section 8(a) (1) by soliciting individual strikers to abandon the strike coupled with coercive statements and promises of benefits. The Board also found that the strike, economic at its inception, was converted by the above mentioned unfair labor practices into an unfair labor practice strike.[4] Of course, our inquiry is limited to deciding whether the findings by the Board are supported by substantial evidence disclosed by the record considered as a whole.[5]

Louisiana Garment and Amalgamated Clothing Workers of America (Union), the certified bargaining representative of its production and maintenance employees, participated in approximately 20 negotiation sessions, between 27 May 1965 and 20 February 1966, in an effort to arrive at a labor agreement. The Union suspended negotiations in February to concentrate on organizing Bonck employees. At this point, the parties had reached accord on certain issues, but the "economic" items including wages, holidays, vacations, and insurance, remained unresolved.

Pursuant to a Board election, the New Orleans Joint Board, an association of the Union's locals, was certified in September 1966 as the bargaining representative of Bonck employees. Bonck rejected the Union's suggestion that it engage in joint bargaining with Louisiana Garment, but agreed to accept by reference the position already reached in the earlier negotiations. Thereafter, while formally separate, the negotiations proceeded in concourse with both Employers represented by the same counsel.

After Bonck entered negotiations, several bargaining sessions were devoted to

---

1. Both companies manufacture clothing in New Orleans, Louisiana. Hereinafter they will be collectively referred to as Employers from time to time.

2. Pursuant to Rule 18 of the Rules of this Court, we have concluded on the merits that this case is of such character as not to justify oral argument and have directed the clerk to place the case on the Summary Calendar and to notify the parties in writing. See Murphy v. Houma Well Service, 5 Cir. 1969, 409 F.2d 804, Part I and Huth v. Southern Pacific Company, 5 Cir. 1969, 417 F.2d 526, Part I.

3. 29 U.S.C. §§ 158(a) (5), (a) (1).

4. Employers take no issue with this conclusion which authorized the Board to order reinstatement, though they dispute the existence of the unfair labor practices. See N. L. R. B. v. Safway Steel Scaffolds Co. of Ga., 383 F.2d 273, 280–281 (5th Cir. 1967), cert. denied, 390 U.S. 955, 88 S.Ct. 1052, 19 L.Ed.2d 1150 (1968); N. L. R. B. v. J. H. Rutter-Rex Mfg. Co., 245 F.2d 594 (5th Cir. 1957).

5. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

consideration of a proposed contract and wage demands submitted by the Union. On 31 October 1966 the Employers submitted substantially identical economic proposals in separate meetings with the Union. At the same time, the Employers indicated that they were negotiating with their insurance carrier in an effort to "upgrade" their insurance program, though no definite proposal was made. The Employers' economic package contained no mention of vacations. The Union representatives stated that they would present the proposal to the union membership for their approval or rejection. On 2 November, at a joint meeting of both groups of employees, all but two of the 360 present voted to strike. The strike commenced on the following day.

On 3 November the Employers sent identical letters to their respective employees. The letters set out the new wage scale which the companies had offered to the Union and stated in part:

In addition to the increase in wages, the company advised the Union of its intent to increase the benefits under the hospitalization plan, and to increase the vacation time from one to two weeks.

The union representatives did not refuse the company's offer. They did not even indicate that it was not acceptable. Instead, without any notice or discussion whatsoever, the union called a strike, which a lot of you did not want.

* * * * * *

We are going to continue operating. Those who come to work, together with any replacements which are hired, will be paid at the new rates in accordance with the above schedule. Since the union has not even bothered to reply to our wage proposal, we are putting it into effect immediately.

* * * * * *

Your jobs are available at increased rates of pay. Don't let the union destroy these jobs by continuing the strike.

The letters attributed the strike to the Union's insistence on the inclusion of union security and checkoff provisions in the contract.

There followed a series of letters from both Employers entreating the strikers to return to work before their jobs were filled by replacements. On 13 January 1967, Louisiana Garment sent a letter indicating that it would curtail a portion of its operation if the strike continued. a subsequent letter stated that such a reduction would not be necessary and sought to induce the strikers to return to work by pointing out that the second step of the previously announced pay increase was about to become effective.

Between the inception of the strike and the hearing before the Trial Examiner, there were seven bargaining sessions involving the Union and the Employers. At one of these sessions, the Union lowered its wage demand to within five cents of the Employers' proposal, contingent on agreement on other questions. The Union also proposed an insurance program. The new Union wage proposal was rejected at a later session, and the Union reduced its demand further.

The Trial Examiner found that both Employers were guilty of 8(a) (5) and 8(a) (1) unfair labor practices. He also found that Louisiana Garment had committed independent violations of 8(a) (1). His proposed order required the Employers to cease and desist from the prohibited conduct, and to bargain collectively, upon request, with the appropriate Union group. Inasmuch as he found the strike had been converted to an unfair labor practice strike, the Trial Examiner ordered reinstatement, on application, of all striking employees. The Board adopted the findings and recommendations of the Trial Examiner.

I

We will first consider the unfair labor practices found by the Board arising from the Employers' institution of economic changes and the solicitation of

employees following the commencement of the strike. Respondent Employers do not basically dispute either the facts or the controlling legal principles, but contend that the Board erred in failing to find either or both of the following: (a) that the parties had bargained to impasse at the time wages were increased; (b) that the Union concurred in the granting of the increase, waiving its right to bargain or to complain.

An employer's unilateral change in the conditions of employment, which are the subject of negotiation, amounts to a refusal to bargain concerning such conditions in violation of 8(a) (5).[6] There is ample record support for the Board's finding that the Employers instituted economic changes affecting wages, insurance benefits, and vacations, on 3 November 1966. The Employers initially contend that this unilateral action was justified by the existence of an impasse in negotiations.[7]

As the court observed in Dallas General Drivers, Warehousemen and Helpers, Local No. 745 v. N. L. R. B.,[8] the determination of whether the parties to negotiations have reached an impasse is a question of fact peculiarly suited to the Board's expertise. Additionally, the Board's finding of no impasse has ample basis in the record. The changes were instituted only three days after the economic proposal had been made to the Union. Actual discussion of the proposal did not occur until after the strike and the unilateral action by the Employers.

The negotiations in fact continued through the strike period, with the Union moderating its wage demand on two occasions.[9] The Employers do not contend that the strike constituted an impasse per se, or that it relieved them of their duty to bargain;[10] but urge that it should be considered as evidence of an impasse. However, on the facts of the present case, the evidence is not persuasive. The Board reasonably concluded that the strike was merely a "pressure tactic", designed to strengthen the Union's bargaining position, and was not a repudiation of the negotiations.

Moreover, the Employers' argument that the parties were at impasse is relevant only to the new wage scale implemented by the Employers. The total economic package offered in their letters of 3 November 1966 included an increase in hospitalization benefits and vacation time. Neither of these proposals had been submitted to the Union. The Employers had steadfastly maintained that they would not change their vacation policy, and insurance had only been mentioned in indefinite terms. A bargaining impasse only allows an employer to implement terms previously offered to the union, and could not excuse the Employers' unilateral action regarding insurance and vacation terms.[11]

On the facts of this case, we find no merit in the Employers' argument that the Union waived its right either to bargain or to complain. This court rejected a similar argument in

6. N. L. R. B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) ; N. L. R. B. v. American Mfg. Co. of Tex., 351 F.2d 74, 79 (5th Cir. 1965).

7. See N. L. R. B. v. Tex-Tan, Inc., 318 F.2d 472 (5th Cir. 1963) ; N. L. R. B. v. Herman Sausage Co., 275 F.2d 229 (5th Cir. 1960).

8. 122 U.S.App.D.C. 417, 355 F.2d 842, 844–845 (1966) (Burger, J.)

9. In N. L. R. B. v. Dell, 283 F.2d 733, 740 (5th Cir. 1960), this court described "impasse" as the point in negotiations where the parties had "exhausted bargaining possibilities" and "where further meetings would have been fruitless."

10. See N. L. R. B. v. J. H. Rutter-Rex Mfg. Co., 245 F.2d 594 (5th Cir. 1957) ; N. L. R. B. v. Safway Steel Scaffolds Co. of Ga., 383 F.2d 273 (5th Cir. 1967), cert. denied, 390 U.S. 955, 88 S.Ct. 1052, 19 L.Ed.2d 1150 (1968).

11. See N. L. R. B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) ; N. L. R. B. v. Crompton-Highland Mills, Inc., 337 U.S. 217, 69 S.Ct. 960, 93 L. Ed. 1320 (1949) ; N. L. R. B. v. Intracoastal Terminal, Inc., 286 F.2d 954, 959 (5th Cir. 1961).

Armstrong Cork Co. v. N. L. R. B.,[12] stating:

> The statutory requirement of good faith bargaining is not subject to waiver through action or inaction of parties to a labor controversy, and may not be satisfied by speculative assumptions as to acceptance or refusal of an offer based on a party's attitude in prior negotiations.

 We also find the Board's conclusion, that the solicitation of employees during the strike was an effort to circumvent the Union and engage in impermissible direct negotiations with the employees, has substantial support in the record. The initial letter from the Employers was issued the very day the strike commenced, offering terms directly to the employees on which there had been no meaningful negotiation with the Union. Numerous subsequent letters exhorted the employees to return and benefit from the earlier offer while there was still time.[13] It was reasonable to infer that these efforts, ignoring the Employers' duty to bargain collectively, were designed to bring about direct negotiations with employees and undermine the Union's position. We reject the Employers' contention that these communications were privileged as "free speech" under Section 8(c) of the Act.

## II

The Board also found that Louisiana Garment had violated Section 8(a) (1) of the Act in soliciting five individual strikers to return to work. It found that Louisiana Garment's agents, through personal visits and telephone calls, employed threats and offers of benefit in a systematic effort to coerce these employees to abandon the strike.[14] The record discloses that these statements included the repeated offer of the illegally granted wage increase, the threat that jobs would be lost as a result

of Louisiana Garment curtailing a portion of its operation, and implications that the company would not sign with the Union. Louisiana Garment does not deny these contacts, but, in effect, makes a de minimis argument that the number of strikers solicited was relatively small. We feel the Board's conclusion of an independent 8(a) (1) violation by Louisiana Garment is supported by the record.

In accordance with the foregoing, the order of the Board is enforced.

---

12. 211 F.2d 843, 848 (5th Cir. 1954).

13. Both Employers informed the strikers that replacements were being hired. In a letter dated 13 January 1967, Louisiana Garment stated that it was considering the elimination of a portion of its operation if the strike continued.

14. See N. L. R. B. v. Shurett, 314 F.2d 43 (5th Cir. 1963).