**NEW YORK PRINTING PRESSMEN AND OFFSET WORKERS UNION NO. 51, INTERNATIONAL PRINTING AND GRAPHIC COMMUNICATION UNION, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 853, Docket 75–4240.

United States Court of Appeals, Second Circuit.

Argued April 12, 1976.

Decided June 21, 1976.

Thomas J. Lilly, New York City (Doran,
Colleran, O'Hara, Pallio & Dunne, P. C.,
New York City, of counsel), for petitioner.

Janet C. McCaa, Washington, D. C. (N. L. R. B., John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Elliot Moore, Deputy Associate Gen. Counsel, Washington, D. C., on the brief,.Allison W. Brown, Jr., Washington, D. C., of counsel), for respondent.

Before LUMBARD, HAYS and FEINBERG, Circuit Judges.

HAYS, Circuit Judge:

Petitioner, New York Printing Pressmen and Offset Workers Union, No. 51, International Printing and Graphic Communications Union, AFL–CIO (the "Union"), seeks review of a decision and order of the National Labor Relations Board[1] dismissing a complaint against Milbin Printing, Inc., Morlain Press, Inc., Pressure Sensitive Tape and Labor Corp., MCM Advertising, Inc., Courtney Press, Inc. (the "Company" or "Employer") which alleged several violations of the National Labor Relations Act, 29 U.S.C. § 151 et seq. We grant the petition and reverse the Board's order.

The Employer is engaged in the printing, sale, and distribution of labels, forms and related products. Following an organizational campaign and Board-conducted election, the Union was certified as the exclusive bargaining representative for the Employer's production employees on October 10, 1972. Between October 26, 1972 and October 10, 1973 representatives of the Employer and Union met in 21 separate negotiating sessions. At the first meeting on October 26, 1972, Julius Seide, the Union's business representative and main negotiator presented the Union's Master Contract to Daniel Cooper, the Employer's principal negotiator and one of four brothers who owned and controlled the Company. The parties reviewed the language of the proposed contract on November 9 and 29, 1972 and on December 14, 1972 agreed to defer discussion of salary increases until accountants had completed the year-end audit of the Company's books.

On January 16, 1973 the Union's negotiator, Seide, made the first wage proposal, asking for a 10 percent increase in employee salary and welfare benefits for each year of a three-year period upon execution of an agreement. Cooper countered with a proposed 2 percent salary increase over an 18 month period and continuation of the current 6.9 percent gross payroll appropriation for welfare and pension purposes. The Union rejected this offer and discussion then switched to other areas of the Union's proposed Master Contract, including the provision for union-security.

The parties next met on January 25, 1973. According to Seide's testimony Cooper stated that he "couldn't reach [the Union's] numbers . . . meaning the proposal that [the Union] had made [on January 16]." Seide told Cooper "that if he couldn't reach our numbers and the Company couldn't do it, if we could see the books at that time we would then tailor a contract to fit his financial . . . ability to pay . . . ." Cooper refused to produce the requested financial records stating that they were "nobody's business." As the negotiating session proceeded Cooper made a new wage offer and the Union countered by reducing its initial demands on this issue. Agreement was reached on other terms which Seide reduced to writing but which Cooper refused to sign until the entire contract was completed.

On February 6 Seide presented Cooper with the Union's new reduced wage proposal. Cooper reiterated that "he couldn't reach our [the Union's] numbers" but promised to discuss the proposal with his brothers. At a meeting held on February 15 matters previously discussed were reviewed by the participants.

Seide and Cooper met again on March 8. Seide presented a lower Union wage figure and placed on the table its entire economic proposal including welfare and pension benefits and union security. Cooper again repeated that he "couldn't reach" the Union's "numbers." At the next bargaining session on March 27 the Union again lowered its

---

1. The Board's decision is reported at 218 N.L.R.B. No. 29 (1975).

wage demands and again Cooper's response was that "your numbers are too steep for us, we can't reach your numbers . . ." Cooper again refused to disclose any company financial records. The next session was conducted on April 3. The Union invited another Company offer and Cooper, according to Seide, replied that "he had no other offer at this time. They couldn't reach our numbers and they would sit with their proposal to us." Seide accused the Company of bargaining in bad faith and, as a bargaining tactic, the five Union members sat silently at the bargaining table for approximately 30 minutes.

At the next meeting on May 15 Seide asked Cooper about the Company's present position on the Union's latest offer and Cooper again replied that he "couldn't reach [the Union's numbers], he couldn't give . . . any more." On the morning of May 16 the Union began a strike in which 6 employees in the bargaining unit participated while 18 crossed their Union's picket line. On June 19 the parties met again. The Union made another proposal regarding wages which was less than its previous offer and the Company countered with a wage provision better than its previous proposal. The Union agreed to accept the Company's offer but a last minute disagreement over the granting of Union security foreclosed a contract settlement. Seide and Cooper next met on July 5 at which time the Union lowered its wage demands and made other proposals, including an agency shop clause. Agreement was not reached and the strike continued. The parties again

met on September 11 and 24 and October 3. A few items proposed by the Union were agreed upon.

The final bargaining session took place on October 10 when the Employer made its final offer which amounted to a 5 percent wage increase. Seide objected to the proposal stating that the parties still had unfinished negotiations. Nevertheless, on October 12 the Employer instituted the wage increase for all employees, retroactive to August 1. Since that date no further negotiations between the parties have taken place.

On the basis of the foregoing facts the National Labor Relations Board concluded (one Member dissenting),[2] in agreement with the Administrative Law Judge, that the Employer bargained in good faith at all material times with its employees' collective bargaining agent and accordingly dismissed the complaint filed by the General Counsel alleging violations of Section 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5), (1).[3] We believe the Board's determination is unsupported by substantial evidence on the record as a whole, see *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and contrary to the applicable judicial precedents. We therefore reverse the Board's dismissal of the complaint.

In *NLRB v. Truitt Manufacturing Co.*, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956), the Court held that where an employer stated to its employees' bargaining representative that it could not afford to pay higher wages but refused to substan-

---

**2.** Pursuant to Section 3(b) of the National Labor Relations Act, 29 U.S.C. § 153(b), the Board delegated its authority in this proceeding to a three-member panel.

**3.** 29 U.S.C. § 158 provides, in relevant part:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\* \* \* \* \* \*

"(5) to refuse to bargain collectively with the representatives of his employees . .

\* \* \* \* \* \*

"(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession . . . ."

tiate its claim with relevant financial records of its operations, the Board properly found a refusal to bargain collectively in violation of Section 8(a)(5) and (1). *See also, C–B Buick, Inc. v. NLRB* 506 F.2d 1086, 1091 (3d Cir. 1974); *NLRB v. Palomar Corp.*, 465 F.2d 731, 734 (5th Cir. 1972); *NLRB v. Bagel Bakers Council of Greater New York*, 434 F.2d 884, 888 (2d Cir. 1970), *cert. denied*, 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 648 (1971); *NLRB v. Southland Cork Co.*, 342 F.2d 702, 706 (4th Cir. 1965); *NLRB v. Jacobs Manufacturing Co.*, 196 F.2d 680, 684 (2d Cir. 1952). *Cf. General Electric Co. v. NLRB*, 466 F.2d 1177, 1184 (6th Cir. 1972). Collective bargaining is frustrated when the employer adopts such a tactic since "[g]oodfaith bargaining necessarily requires that claims made by either bargainer should be honest claims," *NLRB v. Truitt Manufacturing Co., supra*, 351 U.S. at 152, 76 S.Ct. at 755, and it is often impossible for the union to determine whether a claimed inability to pay a salary increase is truthful without an opportunity to examine the financial data upon which the employer's decision is based. Lack of knowledge of the actual financial condition of an employer making such a claim makes it difficult for the employees' bargaining agent to know where it stands and thereby hampers it from taking a realistic position in its negotiations. Therefore, "[i]f such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy." *NLRB v. Truitt Manufacturing Co., supra* at 152–53, 76 S.Ct. at 756.

■ Although the Board recognized the rule enunciated in *Truitt* and *Jacobs*, it nevertheless held that in the instant case there had been "no plea of inability to pay within the meaning of [these decisions]"[4] and that they were therefore inapplicable. We disagree and hold that the Board's determination in this respect misinterprets the facts in the record as found by the Administrative Law Judge. *See, United Fire Proof Warehouse Co. v. NLRB*, 356 F.2d 494, 498 (7th Cir. 1966). It is undisputed that the Employer's bargaining representative repeatedly took the position that the Company "couldn't reach" the Union's wage proposals since to do so would not allow the Company to maintain a "proper balance" in its operations. The plain English meaning of this continually reiterated statement clearly indicates that the Employer was claiming an inability to pay the salary increases demanded by the Union. So long as the Employer's refusal reasonably interpreted is the result of financial inability to meet the employees' demand rather than simple unwillingness to do so, the exact formulation used by the Employer in conveying this message is immaterial. *See, NLRB v. Unoco Apparel, Inc.*, 508 F.2d 1368, 1370 (5th Cir. 1975) ("[t]he employees came to the wrong well . . . the well is dry."); *United Steelworkers of America, AFL–CIO, Local 5571 v. NLRB*, 130 U.S. App.D.C.369, 401 F.2d 434, 436 (1968), *cert. denied sub nom., Stanley-Artex Windows v. NLRB*, 395 U.S. 946, 89 S.Ct 2020, 23 L.Ed.2d 465 (1969) ("could not remain competitive"); *International Telephone and*

---

4. The majority opinion of the NLRB stated:

"[W]e agree with the Administrative Law Judge that there was no plea of inability to pay within the meaning of *N.L.R.B. v. Truitt Co.*, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). Daniel Cooper, Respondent's chief negotiator, credibly testified that he never told the union negotiators that Respondent could not afford to pay the union demands; he only stated that his desire to maintain a 'proper balance' for his business did not permit him to 'reach the Union's numbers.' To the same effect, the union negotiators testified that Daniel Cooper never claimed that 'business was bad' and for that reason could not afford to pay more. They never sought an explanation of what was meant by maintaining a 'proper balance.' But Cooper explained at the hearing:

'Proper balance is that I could have my business grow the way it has been accustomed to growing, I could reinvest whatever monies or profits we make to buy new equipment, because my business depends on it, to continually to do the advertising that we do to live in the same fashion that I am accustomed to living in, to draw the same salary. . . .'

This is not the kind of an 'inability to pay' claim which respondent, in the attendant circumstances, was obligated to document under *Truitt*." 218 N.L.R.B. No. 29 (1975).

*Telegraph Corp. v. NLRB*, 382 F.2d 366, 370 (3d Cir. 1967), *cert. denied*, 389 U.S. 1039, 88 S.Ct. 777, 19 L.Ed.2d 829 (1968) (same); *NLRB v. Celotex Corp.*, 364 F.2d 552 (5th Cir.), *cert. denied*, 385 U.S. 987, 87 S.Ct. 601, 17 L.Ed.2d 450 (1966) (same). Moreover, the Employer is not relieved of its obligation to substantiate a claimed inability to pay simply because it does not take an entirely intransigent position in negotiations but, as here, does in fact offer some increase in employee benefits. *See, NLRB v. Truitt Manufacturing Co., supra; NLRB v. Western Wirebound Box Co.*, 356 F.2d 88 (9th Cir. 1966). The obligation arises if the Employer puts in issue its ability to afford the Union's demands. *Compare, United Furniture Workers of America v. NLRB*, 388 F.2d 880, 883 (4th Cir. 1967). In the instant case the record plainly reveals that this is what the Employer in fact did. The Board's opinion emphasizes the fact that, at the hearing below, Cooper indicated that his reference to the maintenance of a "proper balance" referred only to his desire to continue to reap his accustomed profits from the Company. This, the majority concludes, is merely an example of hard bargaining. Even accepting this characterization, it was the Employer's obligation to provide this explanation at the time the Union asked to see his books, not to reserve it until the administrative proceedings many months later. Because the Board found that the Employer stated *"wouldn't"* when the evidence discloses that it claimed it *"couldn't"* meet the Union's demands, *see United Fire Proof Warehouse Co. v. NLRB, supra* at 498, we are compelled to reverse the Board's decision.

Since the Board concluded that the Employer's refusal to produce to the Union its requested financial records did not constitute a failure to bargain collectively in violation of Section 8(a)(5) and (1), it also held that the Employer's unilateral grant of a wage increase on October 12, 1973 was permissible under the Act in view of the existing bargaining impasse and the fact that the increase did not exceed the amount agreed to in the previous negotiations. *See, NLRB v. Crompton-Highland Mills Inc.*, 337 U.S. 217, 224–25, 69 S.Ct. 960, 93 L.Ed. 1320 (1949). However, in the absence of a genuine impasse a unilateral change in employee benefits by an employer is a violation of its statutory duty to bargain collectively. *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). There can be no genuine impasse which permits unilateral employer action with respect to wages if, as we find here, the employer has failed to bargain in good faith. *See, e. g., Industrial Union of Marine & Shipbuilding Workers v. NLRB*, 320 F.2d 615, 621 (3d Cir.), *cert. denied*, 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1963). The fact that the Union and Employer had reached tentative agreement on the wage issue despite the Employer's refusal to supply the required financial data is irrelevant under these circumstances. *NLRB v. Fitzgerald Mills Corp.*, 313 F.2d 260, 265 (2d Cir.), *cert. denied*, 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963); *NLRB v. Yawman & Erbe Manufacturing Co.*, 187 F.2d 947, 949 (2d Cir. 1951). We therefore hold that the Employer's grant of a wage increase on October 12, 1973 constituted a separate Section 8(a)(5) violation.[5]

The order of the National Labor Relations Board dismissing the complaint is reversed and the case is remanded to the Board for entry of appropriate orders.

---

5. With respect to the petitioner's final point that the Employer unjustifiably changed its position regarding a union security clause thereby evidencing bad faith bargaining we find that the Board's determination that the Employer's conduct disclosed no unexplained shift in bargaining position is fully supported by substantial evidence in the record.