**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SOUTHERN MATERIALS COMPANY, Inc., Respondent.**

**No. 15176.**

United States Court of Appeals, Fourth Circuit.

Argued May 4, 1971.

Decided July 9, 1971.

Donald W. Savelson, Atty., National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Herman M. Levy and Kenneth Pearlman, Attys., National Labor Relations Board, on brief), for petitioner.

Charles F. Henley, Jr., Jacksonville, Fla. (O. R. T. Bowden and Hamilton & Bowden, Jacksonville, Fla., on brief), for respondent.

Before HAYNSWORTH, Chief Judge, and BOREMAN and WINTER, Circuit Judges.

WINTER, Circuit Judge:

The Board found that Southern Materials Company, Inc. violated § 8(a) (5) and (1) of the National Labor Relations Act by unilaterally discontinuing a practice of paying Christmas bonuses to employees without consulting the union. The Board's order, for which enforcement is sought, directed the company to cease and desist from this unfair labor practice and others of like nature, to post appropriate notices and to pay the bonus with interest. We decline enforcement of the order, but we remand the case to the Board for further proceedings.

I

Since 1961 the company has paid Christmas bonuses to its employees. The bonuses varied in amount from $10 to $100. During this period, the company was apparently not unionized but after an election, on December 29, 1967, unions were certified by the Board as the joint collective bargaining representatives for a unit of truck drivers at five of the company's Virginia locations. Bargaining on a contract later ensued.

Preparatory to contract negotiations, the unions asked the company, on January 12, 1968, to furnish data with regard

to "wages, health and welfare, pension, holidays, vacation, bonus, now being paid to employees under bargaining unit * * *." The company furnished the requested data with regard to wages, health and welfare and life insurance programs, pensions, holidays and vacations; but with respect to "bonus," the company advised that "no bonus is paid to any employee."

Formal negotiations for a contract began March 19, 1968, and continued until August 30, 1968, when agreement was reached. During their course, the unions proposed a maintenance of standards clause which the company considered too lengthy and offered instead the language "no employee shall suffer a reduction in his hourly rate of pay by the execution of this agreement." When the union representative inquired about what employees were receiving, the company representative avoided a direct answer and said that the subject of discussion was "benefits. We are talking everything that the men will receive above what they are receiving now." The union representative then agreed to accept the company's proposed maintenance of standards clause "as the men could not lose anything that they were not [sic] receiving." Before the trial examiner, the testimony of whether Christmas bonuses or presents was ever referred to in these exchanges was conflicting. The union representative testified that no references were made; the company representative testified to the contrary. The trial examiner indicated that he would believe the union witness and discredit the company witness, although under his legal theory of how the case should be decided it was unnecessary for him to employ this credibility determination.

In addition to the maintenance of standards clause, the contract contained an article on waiver—the so-called "zipper clause"—which read:

> The Company and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall

not be obligated to bargain collectively with respect to any subject matter referred to or covered in this Agreement, or with respect to any subject matter not specifically referred to or covered in this Agreement.

Late in November, 1968, the union filed a charge that since August, 1968, the company had unilaterally discontinued established practices as to sick leave, paid time during bad weather and employees' birthday cakes, claiming that these were unfair labor practices in violation of § 8(a) (5) of the Act. While the charge was under investigation, the company failed to pay its annual Christmas bonus, and this fact became known to the Regional Director. By letter dated March 12, 1969, the Regional Director informed the parties that no complaint with respect to the specific items in the union's charge would issue, but that the matter of the Christmas bonus would be given further consideration. On August 6, 1969, the Regional Director's complaint, alleging that the unilateral discontinuance of the Christmas bonus was a violation of § 8(a) (5), was issued.

II

At the outset, we reject the company's argument that, because the alleged unfair labor practice occurred more than six months prior to the issuance of the complaint, the Board lacked jurisdiction under § 10(b) of the Act to determine whether the unilateral discontinuance of a Christmas bonus constituted an unfair labor practice. The limitations provision of § 10(b) concerns itself with the period between the unfair labor practice and the charge, not between the unfair labor practice and the complaint. In pertinent part, it states "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge * * *." 29 U.S.C.A. § 160(b).

In NLRB v. Fant Milling Co., 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243 (1959), the Court held that a complaint could allege an unfair labor practice occurring *after* the filing of the charge if the

subsequent act is "of the same class of violations as those set up in the charge." 360 U.S. at 307, 79 S.Ct. at 1183. This case is dispositive of the company's contention. The union's complaint charging unfair labor practices in violation of § 8 (a) (3) and (5) was filed in November, 1968, within ninety days after the acts complained of. Although notice was given on March 12, 1969, that the original charges would not be further considered, the unilateral discontinuance of the Christmas bonus had meanwhile allegedly occurred, and the right to consider it was specifically reserved for further consideration in the March 12, 1969, letter. Discontinuance of the bonus was an alleged violation of § 8(a) (5) of the Act, and it was of the same class of violations as those originally complained of. It follows that under *Fant* there was a timely charge with respect to discontinuance of the bonus, and the Board had jurisdiction to hear and determine a complaint alleging it.

### III

■ On the merits, the Board, recognizing the general rule that § 8(d) of the Act imposed on the company a duty to bargain with the union "with respect to wages, hours, and other terms and conditions of employment," concluded that the union had not waived its right to require the company to bargain by the waiver paragraph of the contract between the parties. It, therefore, concluded that the failure to bargain constituted an unfair labor practice. It maintains this position before us. The company, on the other hand, while not questioning its basic duty to bargain, argues that the waiver paragraph of the contract expressly relieved it of this duty during the life of the contract, and we agree.

The text of the waiver clause relieved each party of the obligation to bargain collectively during the term of the contract not only with respect to "any subject matter referred to or covered in" the contract, but, more importantly, with respect to "any subject matter *not* spe-

cifically referred to as covered in" the contract. (emphasis added.) Thus, whether the maintenance of standards clause is construed to include or exclude Christmas bonuses is immaterial with respect to the company's obligation and the union's right to bargain, because the waiver of the duty to bargain expressly included that which was excluded from the contract as well as that which was included. This is not to say, however, that if the maintenance of standards clause includes Christmas bonuses that the company would have any right to discontinue them unilaterally. It would only have the right to decline the union's request to reconsider them during the life of the contract, and conversely the union could decline a similar request by the company.

The breadth of the language to which the parties agreed serves to distinguish the cases relied on by the Board, viz., General Electric Company v. NLRB, 414 F.2d 918 (4 Cir. 1969), cert. den., 396 U.S. 1005, 90 S.Ct. 557, 24 L.Ed.2d 496 (1970); Leeds & Northrup Company v. NLRB, 391 F.2d 874 (3 Cir. 1968); Timken Roller Bearing Company v. NLRB, 325 F.2d 746 (6 Cir. 1963), cert. den., 376 U.S. 971, 84 S.Ct. 1135, 12 L.Ed. 2d 85 (1964), because all of those cases deal with the problem of whether or not to imply a waiver from the language employed and the circumstances in which it was used. While we said in *General Electric, supra,* that "only clear and unmistakable language will warrant a conclusion that waiver was intended" (414 F.2d at 923), language of that character is present in this case. Similarly, in *Timken,* the Sixth Circuit, although it found no implied waiver of the union's right to obtain wage information, said "we recognize that the Union could have relinquished this right under the provisions of the bargaining agreement if it, as a part of the bargaining process, elected to do so." 325 F.2d at 751.

■ While our conclusion with respect to the scope and meaning of the waiver clause of the contract, if expressly applied, renders the Board's order,

premised upon a contrary construction, unenforceable, the questions remain of whether the union was fraudulently induced to agree to the waiver clause or whether the phrase "hourly rate of pay" in the maintenance of standards clause constituted words of art sufficiently broad to include the regularly, previously paid Christmas bonuses. These questions are raised because of the evidence that the company led the union to believe that the company meant to maintain all present benefits and not just the hourly rates of pay, and because of the evidence from which it could possibly be inferred that the company sought to conceal from the union that it had regularly paid to employees Christmas bonuses for over six years. It may be that the company contracted to continue to pay Christmas bonuses or that the union should be relieved of its waiver of the company's obligation to bargain concerning discontinuance of Christmas bonuses. In either event, the company may have committed an unfair labor practice. See, e. g., NLRB v. C & C Plywood Corp., 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967); NLRB v. St. Louis Cordage Mills, 424 F.2d 976 (8 Cir. 1970); NLRB v. Scam Instrument Corporation, 394 F.2d 884 (7 Cir. 1968), cert. den., 393 U.S. 980, 89 S.Ct. 449, 21 L.Ed.2d 441 (1968). But on these questions the Board made no findings of fact and conclusions of law because of the legal theory which it thought dispositive of the proceeding. Since their resolution will require more specific findings of credibility than were made, the drawing of inferences and perhaps also the taking of additional evidence with regard to the negotiations between the parties, it is appropriate that they be litigated in the first instance before the Board. We express no opinion on how they should be resolved.

We, therefore, decline to enforce the Board's order, but we remand the case to the Board for further proceedings in accordance with this opinion.

Because further proceedings are required, we must also rule on the company's contention that the trial examiner improperly excluded from evidence the Regional Director's letter of March 12, 1969, in which he advised the parties that the original charges would not be prosecuted but the matter of discontinuance of the Christmas bonus would be considered further. The letter was offered to discredit the testimony of the union representative that in precontract discussions with the company the subject of Christmas bonuses or presents was not mentioned. The company argues that the letter had this probative effect because the union representative testified that the subjects of a loan plan, sick leave, and pay during inclement weather were also *not* discussed, but yet the Regional Director found that they were. Hence, it can be inferred, so the argument runs, that the union representative was untruthful as to part of his denial and should also not be believed in his denial of any mention of Christmas bonuses.

■ We agree that the letter should have been admitted. When the union's complaint was filed, the Regional Director was authorized to issue and serve on the parties a formal complaint. 29 C.F.R. § 102.15. Presumably, the Regional Director would make some investigation of the matter to enable him to decide how to exercise this discretion. Certainly he did so in this case. If the Regional Director declines to issue a complaint, or, having issued one, concludes to withdraw it, the charging party may appeal to the General Counsel for review of the Regional Director's action or inaction. 29 C.F.R. § 102.19. Significantly, the union elected to take no appeal in this case, so that we infer that it did not dispute the Regional Director's implied finding that the complaint was lacking in evidentiary support.

We conclude, therefore, that, although not conclusive, the letter is not so devoid of probative value for purposes of impeachment that it should have been excluded. It should be admitted in the proceedings on remand.

*Enforcement denied and remanded.*