**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**PEPSI–COLA DISTRIBUTING COMPANY OF KNOXVILLE, TENNESSEE, INC., Respondent.**

**No. 79–1314.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 2, 1981.

Decided May 1, 1981.

Elliott Moore, Deputy Associate Gen. Counsel, John Ferguson, Joseph Norelli, N.L.R.B., Washington, D. C., Curtis L. Mack, Director, Region 10, N.L.R.B., Atlanta, Ga., for petitioner.

J. W. Alexander, Jr., Blakeney, Alexander & Machen, Charlotte, N. C., for respondent.

Before EDWARDS, Chief Judge, BROWN, Circuit Judge, and BATTISTI,* District Judge.

---

EDWARDS, Chief Judge.

The National Labor Relations Board petitions for enforcement of its order entered April 13, 1979, reported at 241 NLRB No. 136.

Pepsi-Cola Distributing Company of Knoxville, Tennessee, Inc. purchased a distributorship previously owned and operated by Hartman Beverage Company. For a considerable number of years, Hartman had paid its route salesmen a year-end bonus calculated at one cent per case sold by individual route salesmen during the previous year. The bonus was paid annually approaching the Christmas season and had been so paid before the union, Teamsters Local Union No. 519, negotiated a one year contract, effective November 27, 1975. At the time of these negotiations, no mention was made of the year-end bonus for route salesmen but Hartman paid the bonus in late 1975. The following year, Hartman and the union executed another contract and the bonus was discussed but no reference to it was put in the labor management contract.

During the year 1976, respondent Pepsi-Cola Distributing Company purchased Hartman's business without actual knowledge of the Hartman practice of paying a one cent a case bonus to its salesmen. While the new ownership became effective February 1, 1977, and the management told the route salesmen that there would be no change in pay structure, the record indicates that the new management did not become aware of the bonus until some time in May. Respondent did not discuss the matter with the union or with its route salesmen until some of them began asking about the bonus, at which time General Manager Moore reviewed Hartman's payroll records and found that Hartman had paid its route salesmen the full rate due under the contract and that the one cent per case bonus was paid in addition to

---

* Honorable Frank J. Battisti, Chief Judge, United States District Court for the Northern District of Ohio, sitting by designation.

wages under the contract. At that point, Moore informed the route salesmen that he would not pay the year-end bonus.

On complaint filed by the General Counsel alleging that the company had violated Section 8(a)(5) and (1) of the National Labor Relations Act by unilaterally withholding the 1977 bonus, the Administrative Law Judge who heard this case initially found that the Christmas bonus "was essentially part of [the route salesmen's] employment as distinguished from being in nature a gift or gratuity" and that the employer was under a duty to negotiate with the union prior to effecting any change therewith, citing *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *Leeds & Northrup Co. v. NLRB*, 391 F.2d 874 (3rd Cir. 1968), unless the union had previously waived its bargaining rights. On his analysis, the ALJ concluded that the waiver clause in the contract previously signed by Hartman with the union served to relieve the successor Pepsi-Cola Distributing Company of any obligation to continue the bonus or to negotiate with the union in relation to discontinuing it in advance of doing so even though the ALJ acknowledged "that employees hired after respondent's takeover were told that their pay and conditions would remain the same." In this respect, the ALJ relied upon *Bancroft-Whitney Co., Inc.*, 214 NLRB 57 (1974).

On review by the NLRB, a three-member panel thereof held that the *Bancroft-Whitney* decision was not determinative in relation to this case. Its reasoning concerning *Bancroft-Whitney* bears quotation here:

> . . . the Board found that the union had clearly waived any right to bargain about the payment of an annual wage dividend during the contract's duration. In that case, bargaining was extensive and the contract contained a clear and specific provision that "all wages and other benefits to be received are contained in this agreement."

> The law is settled that the right to be consulted concerning unilateral changes in terms of employment is a right given by statute and not one obtained by contract and that, in order to establish a waiver of a statutory right, there must be a showing of a clear relinquishment of the right. Whether there has been a clear relinquishment of the right is to be decided on the facts and circumstances surrounding the making of the contract.[4] Having considered all the circumstances herein, we conclude that there has been no showing that the Union relinquished its statutory right to bargain over the year-end bonus.

> [4] *McDonnell Douglas Corporation*, 224 NLRB 881, 887 (1976).

The Board thereupon ordered respondent to cease and desist from "unilaterally without notification of or consultation with the union discontinuing its past practice of conferring upon its route salesmen a year-end bonus" and required the respondent to pay the 1977 year-end bonus and to bargain collectively in relation to any change of practice concerning it.

While this case is not beyond dispute, we conclude that the union had a statutory right to be consulted about changes in relation to the bonus paying practices before it was discontinued and that the Board's order is consistent with Section 8(d) of the Act which requires the parties to "confer in good faith with respect to wages, hours and other terms and conditions of employment." In the unanimous decision in *NLRB v. Katz, supra,* the opinion for the court said as follows:

> The duty "to bargain collectively" enjoined by § 8(a)(5) is defined by § 8(d) as the duty to "meet . . . and confer in good faith with respect to wages, hours, and other terms and conditions of employment." Clearly, the duty thus defined may be violated without a general failure of subjective good faith; for there is no occasion to consider the issue of good faith if a party has refused even to negotiate *in fact*—"to meet . . . and confer"—about any of the mandatory subjects.[10] A refusal to negotiate *in fact* as to any subject which is within § 8(d), and about which the union seeks to negotiate, violates § 8(a)(5) though the employer has every desire to reach agreement with the

union upon an over-all collective agreement and earnestly and in all good faith bargains to that end. We hold that an employer's unilateral change in conditions of employment under negotiation is similarly a violation of § 8(a)(5), for it is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal.[11]

[10] See, e. g., *Labor Board v. Allison & Co.*, 165 F.2d 766 (6 Cir. 1948).

[11] Compare *Medo Corp. v. Labor Board*, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007; *May Department Stores v. Labor Board*, 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145; *Labor Board v. Crompton-Highland Mills*, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320.

In *Medo*, the Court held that the employer interfered with his employees' right to bargain collectively through a chosen representative, in violation of § 8(1), 49 Stat. 452 (now § 8(a)(1)), when it treated directly with employees and granted them a wage increase in return for their promise to repudiate the union they had designated as their representative. It further held that the employer violated the statutory duty to bargain when he refused to negotiate with the union after the employees had carried out their promise.

*May* held that the employer violated § 8(1) when, after having unequivocally refused to bargain with a certified union on the ground that the unit was inappropriate, it announced that it had applied to the War Labor Board for permission to grant a wage increase to all its employees except those whose wages had been fixed by "closed shop agreements."

*Crompton-Highland Mills* sustained the Board's conclusion that the employer's unilateral grant of a wage increase substantially greater than any it had offered to the union during negotiations which had ended in impasse clearly manifested bad faith and violated the employer's duty to bargain.

369 U.S. at 742–743, 82 S.Ct. at 1111–1112.

The dissent in this case relies upon *NLRB v. Southern Materials Co.*, 447 F.2d 15 (4th Cir. 1971). There on somewhat similar facts, enforcement of a Board order to pay Christmas bonuses was denied. In that case, however, the bonuses were small and consistent with being Christmas gifts, as opposed to part of regular compensation.

In our instant case, Pepsi-Cola had assured employees that their compensation would be the same as it had been under the Hartman administration. Additionally, it appears clear to us that the year-end payments were not mere bonuses, but were a regularly calculated part of the route salesmen's compensation, based upon a formula of one cent per case. Thus, what we deal with here, as opposed to *Southern Materials*, is a unilateral management change of one of the fundamental issues of collective bargaining; namely, wages.

On this record, where a successor employer has promised to continue previously established compensation, a general waiver clause, which does not refer specifically to waiver of a portion of the promised compensation, should not be regarded as a clear and unmistakable waiver of the union's right to collective bargaining.

The petition of the Board to enforce its order is hereby granted.

BAILEY BROWN, Circuit Judge, dissenting.

I respectfully dissent.

The precise issue before the Board was whether Pepsi-Cola, as a successor employer that adopted the existing collective bargaining contract effective November 1976-November 1977, committed an unfair labor practice under Section 8(a)(5) by its failure to bargain with respect to the payment of the 1977 Christmas bonus. I recognize that the Union's statutory right to bargain cannot be held to have been waived unless such result is required by the provisions of the collective bargaining contract and the surrounding circumstances. The ALJ determined that the right to bargain was waived by the clear terms of the contract and that the surrounding circumstances did not support a different result. The Board determined that the contract was not clear as to waiver of the right to bargain, and that, moreover, the surrounding circumstances did not support a waiver by the Union. In my view, under the collective bargaining contract the parties waived the right to bargain by language that could not have been clearer had it been written by Abraham Lincoln and etched in stone. Moreover, there was nothing in the surrounding circumstances that supported a different result.

I would agree, as the ALJ determined, that this bonus, though not mentioned in the contract, was not a gratuity and had become part of Hartman's (the predecessor employer's) wage structure. It might well be that, if the Union had taken this bonus issue to arbitration, it should have prevailed. It could have possibly prevailed either on the theory that the bonus claim had not been waived by the contract or on the theory that, even if so waived, Pepsi-Cola in effect "waived the waiver" when it obtained some information from Hartman about the bonus in May of 1977 and did not then take the matter up with the Union. (In May, Pepsi-Cola did receive information from Hartman about the bonus, but it was incorrect; the information was that the route salesmen were paid one cent per case less than the contract rate and that this amount was accumulated and paid as a "bonus" at the end of the year.) But, as I have indicated, the question before the Board was not whether the Union had effectively waived the right to the bonus but rather whether the Union had waived the right to bargain with respect to the bonus. It was not for the Board to determine whether Pepsi-Cola was bound to pay the bonus where, as here, there was an arbitration provision in the contract to resolve such disputes. See *N.L.R.B. v. C & C Plywood Corp.*, 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967), at 426–428, 87 S.Ct. at 562–564.

First, I will deal with the terms of the collective bargaining contract and then with the surrounding circumstances.

The operative provision of this contract provided as follows:

Section 2. The Employer and the Union agree that all matters desired by either party have been presented, discussed and incorporated herein or rejected. *Accordingly, it is agreed that for the life of this Agreement each party voluntarily and unqualifiedly waives the right and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter, whether or not referred to in this Agreement.* (Emphasis supplied.)

In *N.L.R.B. v. Southern Materials Co.*, 447 F.2d 15 (4th Cir. 1971), the Fourth Circuit found the following clause to be a "clear and unmistakable" waiver of the union's right to negotiate about Christmas bonuses. The clause in *Southern Materials* stated (at 17):

The Company and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject matter referred to or covered in this Agreement, or with respect to any subject matter not specifically referred to or covered in this Agreement. 447 F.2d at 17.

There is no difference of consequence between the waiver clause presented here and the waiver clause before the court in *Southern Materials*.

As stated, there is nothing in the surrounding circumstances that could be interpreted as a waiver of this waiver provision. It is without dispute that Pepsi-Cola had no knowledge of this practice of Hartman of paying a Christmas bonus when Pepsi-Cola bought this business and adopted this collective bargaining contract which did not mention bonus, in February of 1977. Pepsi-Cola did, in adopting this contract, verbally assure that compensation of employees would continue as under Hartman, but it obviously meant the compensation set out in the contract would be paid. Pepsi-Cola did receive some incorrect information about the bonus from Hartman, as before stated, in May of 1977 and did not consult with the Union about it. But the only effect this could have possibly had on the rights of these parties would be to create a waiver of its contract right not to pay the bonus. It could not effect a waiver of Pepsi-Cola's contract right not to bargain with respect to the bonus.

Even if the Board were correct in determining that Pepsi-Cola was guilty of an unfair labor practice in failing to bargain with respect to the bonus, it is doubtful that it had the authority to, in effect, adjudicate

the obligation of Pepsi-Cola to pay the bonus (see *C & C Plywood Corp., supra*, 385 U.S. at 428, 87 S.Ct. at 564) rather than to order Pepsi-Cola to bargain. In any case, the Board exercised some overkill when, in spite of Pepsi-Cola's strong position, it ordered Pepsi-Cola to pay the 1977 bonus rather than to bargain with respect to it and when, in spite of the fact that the parties had settled the bonus issue as to future years, it ordered Pepsi-Cola to bargain as to future years.

For these reasons, I respectfully dissent and would deny enforcement.