676 F.2d 826
 110 L.R.R.M. (BNA) 2125, 219 U.S.App.D.C. 228,
94 Lab.Cas. P 13,491
 ROAD SPRINKLER FITTERS LOCAL UNION NO. 669, UNITED
ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE
PLUMBING AND PIPEFITTING INDUSTRY OF THE
UNITED STATES AND CANADA,
AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
A-1 Fire Protection, Inc. and Corcoran Automatic Sprinklers,
Inc., Intervenors.
 No. 80-1840.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 27, 1981.
Decided April 27, 1982.
 
 Woody N. Peterson, with whom Angelo V. Arcadipane, Washington, D. C., was on the brief, for petitioner.
 David A. Fleischer, Atty., N. L. R. B., with whom Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., was on the brief, for respondent.
 Hiram S. Grossman for intervenors.
 Before BAZELON, Senior Circuit Judge, and MacKINNON and GINSBURG, Circuit Judges.
 Opinion for the Court filed by Senior Circuit Judge BAZELON.
 Dissenting opinion filed by Circuit Judge MacKINNON.
 BAZELON, Senior Circuit Judge:
 
 
 1
 This case is before us for the second time on a petition for review of a decision of the National Labor Relations Board (Board). In our earlier opinion,[1] we remanded to the Board because of its apparent failure, without explanation, to apply the longstanding "clear and unmistakable" waiver standard to determine whether a union had forfeited its rights under section 8(a)(5) of the National Labor Relations Act.[2] Upon review of the Board's supplemental decision on remand, we find that the Board has satisfactorily resolved one aspect of the case, but has thrown the core of the case into even deeper confusion. We are therefore compelled to remand once again for explanation and application of the proper legal standard.
 
 I. BACKGROUND
 
 2
 The factual background of this dispute, and its history prior to remand, are set out in our previous opinion.[3] We recapitulate them briefly to put our own discussion into perspective.
 
 
 3
 In 1973, George Corcoran formed two corporations, Corcoran Automatic Sprinklers, Inc. (CAS) and A-1 Fire Protection, Inc. (A-1), to install fire sprinklers. Corcoran intended to carry on a "double breasted" operation, operating CAS as a union company capable of bidding on jobs that required union contractors, and operating A-1 as a nonunion company. Shortly thereafter, Corcoran entered into a contract on behalf of CAS with the Road Sprinkler Fitters Local 669, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO (Local 669). The union was not aware of the existence of A-1 when it signed the CAS contract. When the union did find out, it warned Corcoran that A-1 could not do any maintenance and installation work covered by the CAS contract.
 
 
 4
 There is some evidence in the record that, prior to 1975, the scope of A-1's work and solicitation of work was limited to "small" installation jobs and to noninstallation services such as sales of equipment and shop fabrication.[4] A-1 did not hire any nonsupervisory employees until 1975. In early 1975, Corcoran, with grudging union assent, laid off a number of CAS employees and then hired some of them to work for A-1 at union wages, but without union benefits. Nevertheless, on May 1, 1975, Local 669 entered into a second contract covering CAS employees and did not request that the contract also cover A-1 or its employees.[5] Subsequent to the signing of the second CAS contract, the relative fortunes of CAS and A-1 began to shift.[6] By August 1976, CAS, which had once employed 10 sprinkler fitters, employed only two. It received only one new job in 1976. Meanwhile, the work of A-1, by now definitely extending to "large" jobs, increased and by August 1976, it employed seven sprinkler fitters. Some of the work picked up by A-1 was for former customers of CAS. There is also evidence in the record that Corcoran stated his intention to "phase out" CAS and to have A-1 "tak(e) over the sprinkler work."[7]
 
 
 5
 In late 1975, the union demanded that the 1975 collective bargaining agreement be applied to A-1. When Corcoran refused to comply with the demand, the union filed unfair labor charges against CAS and A-1. The union alleged that CAS and A-1 violated the duty to bargain embodied in § 8(a)(5) by withdrawing work from CAS and by refusing to apply the 1975 agreement to A-1 employees.
 
 
 6
 An Administrative Law Judge held that CAS and A-1 were a "single employer" for collective-bargaining purposes, that their employees jointly constituted an appropriate bargaining unit, and that the collective bargaining agreement should have been applied to both sets of employees. The ALJ also found that Corcoran "changed work arrangements so as to reduce the amount of work for the employees of (CAS)" and "operated A-1 with the apparent purpose of ultimately dissolving (CAS)," and that "but for George Corcoran's attempts to rid himself of (CAS) and the Union," CAS would have performed certain of the work picked up by A-1. The ALJ held that Corcoran, by his diversion of work from CAS to A-1, withdrew and withheld recognition from the union in violation of § 8(a)(5).[8]
 
 
 7
 The Board accepted the ALJ's finding that CAS and A-1 were a "single employer," but held that they nevertheless constituted separate bargaining units. It found that the 1975 agreement between the union and CAS indicated that the parties "at least inferentially, stipulated as to the appropriateness" of a unit limited to CAS employees. The Board refused to hold that the CAS agreement applied to A-1 employees, stating that it could not "impose a contract to which the parties have not agreed."
 
 
 8
 The Board also held that because CAS and A-1 were organized to do union and nonunion work, respectively, and because the union was aware of this arrangement, any increase in A-1's work and decrease in CAS's could not "be attributed to any sinister purpose or unlawful motive on the part of the Respondents, but (had to) be considered the result of changes in the demand for contracts to be performed under union conditions."[9] The Board found the ALJ's conclusion that Corcoran transferred work from CAS to A-1 to be "untenable."[10]
 
 
 9
 Upon review in this court, we found that the Board had, in effect, determined that the union had, by its acquiescence, foregone its statutory rights under § 8(a)(5). We were therefore disturbed by the Board's failure either (1) to apply the traditional rule that a union will not be held to have foregone a statutory right absent a "clear and unmistakable" waiver, or (2) to explain why it was not applying the traditional standard. We remanded to the Board for explanation and application of the proper legal standard.
 
 II. THE BOARD'S SUPPLEMENTAL DECISION
 
 10
 In response to our remand, the Board issued a supplemental decision and order that essentially reaffirmed its previous opinion. The supplemental decision states that the "clear and unmistakable" waiver standard is inapplicable in this case because the crucial question is not whether the union waived its statutory rights, but whether it had any statutory rights in the first place. With regard to the extension of the bargaining agreement to the employees of A-1, the Board argues that the scope of bargaining units is subject to voluntary agreements between employers and union, and that Local 669's acquiescence in a bargaining unit limited to CAS employees was just such a voluntary agreement. A-1 Fire Protection, Inc., 250 N.L.R.B. 217, 220-21 (1980). The Board makes a similar argument with regard to the transfer of work. It suggests that a finding that an employer improperly transferred work from bargaining unit employees to employees of related companies requires a showing that the employer acted surreptitiously and unilaterally. The Board then states that
 
 
 11
 As indicated in the Board's original Decision, there is evidence that since 1975 the work of CAS decreased and that of A-1 increased. However, we will not assume from that alone, particularly in light of the Union's knowledge of Respondent's (sic) double-breasted operation, that Respondents transferred jobs from CAS employees represented by the Union to A-1 employees.
 
 Id. at 219 (emphasis added).[11]
 III. EXTENSION OF THE CAS CONTRACT TO A-1
 
 12
 Upon review of the Board's supplemental decision, we now believe that it has offered satisfactory grounds for finding that Local 669 did not have an independent statutory right to have its contract with CAS extended to the employees of A-1. There is no a priori way to determine whether A-1 and CAS constitute a single bargaining unit. Moreover, the fact that the two companies constitute a "single employer" does not in itself define them as a single bargaining unit. See South Prairie Construction Co. v. Local 627, International Union of Operating Engineers, 425 U.S. 800, 803-05, 96 S.Ct. 1842, 1843-44, 48 L.Ed.2d 382 (1976); NLRB v. Don Burgess Construction Corp., 596 F.2d 378, 386 (9th Cir.), cert. denied, 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979). In the past, both courts and the Board have recognized the bargaining history of an employer and a union as one of a number of factors that may be considered in determining the appropriate scope of a bargaining unit. See Local 627, International Union of Operating Engineers v. NLRB, 595 F.2d 844, 849 n.12 (D.C.Cir.1979); Sambo's Restaurants, Inc., 212 N.L.R.B. 788 (1974). Although it may be a close question, and although the Board's discussion of the issue is not ideal, the Board could reasonably have concluded in this case that the 1975 agreement between Local 669 and CAS weighed substantially in favor of the appropriateness of a bargaining unit limited to CAS employees. If the union had no independent statutory right to represent A-1 employees, the Board is correct that it need not inquire into whether the union has "waived" such a right.
 
 
 13
 Our affirmance of the Board on this one issue must, however, be read very narrowly, and may in fact even be beside the point. Counsel for both the Board and the union agree that the extension of the CAS contract to A-1 employees could arise either out of an independent statutory right of the union or as a prophylactic remedy for Corcoran's violation of some other statutory obligation. This distinction is by no means clear either in the Board's opinions here or in prior cases, but it does make analytic sense. The union now states that it never meant to claim an independent statutory right, but was only seeking extension of the contract to prevent Corcoran from evading the contract and destroying the CAS bargaining unit.[12] The Board's opinions can also be read to see the issue at least partly in a similar light.[13] In any event, our discussion to this point does not foreclose the possibility that the CAS contract should be extended to cover A-1 employees, but merely requires the issue to be postponed until after a satisfactory disposition of the underlying claim that Corcoran has illegally transferred work from CAS to A-1.
 
 IV. TRANSFER OF WORK
 A. The Legal Standard
 
 14
 An employer has a duty to bargain with the representatives of his employees before unilaterally changing the terms and conditions of their employment. See NLRB v. Katz, 369 U.S. 736, 747-48, 82 S.Ct. 1107, 1113-14, 8 L.Ed.2d 230 (1962); NLRB v. Haberman Construction Co., 641 F.2d 351, 357 (5th Cir. 1981) (en banc); Office & Professional Employees International Union, Local 425 v. NLRB, 419 F.2d 314, 321 (D.C.Cir.1969). This statutory duty to bargain is independent of any obligation the employer may incur under his contract with the union. See NLRB v. Pepsi-Cola Distributing Co., 646 F.2d 1173, 1175-76 (6th Cir. 1981); Office & Professional Employees International Union, Local 425 v. NLRB, supra, at 323; Rose Arbor Manor, 242 N.L.R.B. 795, 798 (1979). In particular, a modification of practices established by a consistent pattern of conduct may constitute a change in the terms and conditions of employment whether or not it is also a breach of contract. See Office & Professional Employees International Union, Local 425 v. NLRB, supra, at 323; Robbins Door & Sash Co., Inc., 260 N.L.R.B. No. 88 (1982); Rose Arbor Manor, supra, at 798.[14] In the face of such established practice, the contract is only relevant to the extent that it may indicate the union's waiver of its right to bargain. See NLRB v. R. L. Sweet Lumber Co., 515 F.2d 785, 795 (10th Cir.), cert. denied, 423 U.S. 986, 96 S.Ct. 393, 46 L.Ed.2d 302 (1975); Office & Professional Employees International Union, Local 425 v. NLRB, supra, at 321; Rose Arbor Manor, supra, at 798. Moreover, as we emphasized in our prior opinion in this case, it has heretofore been held that any waiver of a union's statutory rights under the Act, by contract or otherwise, must be "clear and unmistakable."[15]
 
 
 15
 The allocation of work to a bargaining unit is a "term and condition of employment," and an employer may not unilaterally attempt to divert work away from a bargaining unit without fulfilling his statutory duty to bargain. See Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 209, 85 S.Ct. 398, 402, 13 L.Ed.2d 233 (1964); International Union, UAW v. NLRB, 381 F.2d 265, 266 (D.C.Cir.), cert. denied, 389 U.S. 857, 88 S.Ct. 82, 19 L.Ed.2d 122 (1967). In the past, such improper transfers of work have been found, for example, when an employer set up a "runaway shop" at another location, see, e.g., NLRB v. Triumph Curing Center, 571 F.2d 462, 473 (9th Cir. 1978), subcontracted work, see, e.g., Fibreboard Paper Products Co. v. NLRB, supra, or, as is alleged in this case, diverted work from bargaining unit employees to non-bargaining unit employees, see, e.g., Soule Glass & Glazing Co. v. NLRB, 652 F.2d 1055, 1088 (1st Cir. 1981); Office & Professional Employees International Union, Local 425 v. NLRB, supra, at 321. As is clear from the cases we cited in our first opinion, the heretofore accepted test for whether work has been transferred away from a bargaining unit is whether, as a result of decisions by the employer, the bargaining unit in question has suffered an adverse impact. See Office & Professional Employees International Union, Local 425 v. NLRB, supra, at 321; International Union, UAW v. NLRB, supra, at 266. In other words, the proper question in this case, leaving aside a possible "waiver" by the union, would seem to be whether Corcoran changed the scope of CAS' activities or changed the method of allocating work between CAS and A-1 so as to have caused the CAS bargaining unit to lose work which, in light of Corcoran's past practices, CAS would otherwise have been expected to perform. See Office & Professional Employees International Union, Local 425 v. NLRB, supra, at 321, 323. Cf. Western Massachusetts Elec. Co. v. NLRB, 573 F.2d 101, 106 (1st Cir. 1978).[16]
 
 
 16
 We do not mean by our account of the traditional test of whether work has been "transferred" to suggest that the Board, in the absence of a "waiver", could never find that the union side of a double-breasted operation died a natural death while the nonunion side gained business. The crucial determinant is whether the change in relative economic fortunes was due to external economic circumstances or to a change in the employer's established practices. It is easy to envision, for example, a double-breasted operation governed by the employer's established practice to assign to the union side of the operation only work that requires union labor, and to assign all other work, of whatever size or type, to the nonunion side. In that case, if certain customers (including even past customers of the union side) decided on their own no longer to require union labor, then it would not be a change in established practice for the employer to solicit that work on behalf of, and assign it to, the nonunion side of the operation. But the hypothetical established practice we have just described is not the only way a double-breasted operation can be organized. See, e.g., Peter Kiewit Sons' Co., 231 N.L.R.B. 76, 77 (1977), enf'd, 595 F.2d 844 (D.C.Cir.1979) (union and nonunion companies had different maximum dollar amounts for work that they could undertake and union company engaged in a greater variety of work than nonunion company); Frank N. Smith Associates, 194 N.L.R.B. 212, 215 (1971) (union company performed commercial and industrial jobs obtained by bids; nonunion company performed "Smaller Cost" commercial, industrial, and residential jobs obtained by negotiation without bids).[17] A union company is perfectly capable of doing work that does not require union labor, and an employer may have good reason for assigning such work to his union company. Whether the solicitation of a given piece of work on behalf of, or the assignment of that work to, the nonunion side of a double-breasted operation constitutes a transfer of work from the union side must therefore depend on the pattern of allocation established by the past practice of the employer in that particular double-breasted operation.
 
 B. The Board's Reasoning
 
 17
 The Board's opinions in this case neither comport with the principles outlined above nor provide an adequate explanation for why different principles should apply. Indeed, we still do not think that the Board has confronted the central issues raised by Local 669's claim that Corcoran unilaterally transferred work from CAS to A-1 without fulfilling his statutory duty to bargain.
 
 
 18
 We originally remanded this aspect of the case to the Board because of its reliance in its original opinion on the union's "accept(ance)" of Corcoran's double-breasted operation.[18] The Board's supplemental opinion relies even more heavily on union "acquiescence." 250 N.L.R.B. at 219. As best we can tell, the Board justifies its application of an "acquiescence" standard by little more than a questionable extension of its more successful explanation for why union "acquiescence" was relevant to determining the appropriateness of a bargaining unit limited to CAS employees. As is clear from our discussion above, however, the heretofore accepted test for whether work has been transferred away from a bargaining unit is not union "acquiescence," but whether the employer's action has caused the bargaining unit to lose work that, in light of previously established practices, it would otherwise have been expected to perform. The union may forego its right to bargain, but only by "waiver," not by "acquiescence." The Board has not applied the longstanding rule that waivers must be "clear and unmistakable"-nor has it explained why a different waiver standard is more consistent with the policy of the statute. We must therefore reaffirm our previous conclusion that the Board has not engaged in the sort of reasoned decisionmaking upon which a reviewing court must depend.
 
 
 19
 Even if we discount the Board's reliance on union "acquiescence," we find it difficult to construct a more satisfactory account of the Board's reasoning. The other major ground on which the Board relies in its supplemental opinion is that Corcoran did not act "surreptitiously" or use "deception and misrepresentation" in assigning work to A-1. 250 N.L.R.B. at 219. Although we can see how surreptitious behavior could be one factor in an inquiry into the nature of an employer's activities, we do not understand how the lack of such behavior can be dispositive of a claim that the employer has committed an unfair labor practice. Such a rule of law would give employers license to do whatever they wished, as long as they did it openly-a result that would be patently irrational.[19]
 
 
 20
 The Board's original opinion is similarly incomplete. Although the Board did find in that opinion that "CAS and A-1 were organized on the same day to handle union and nonunion business, respectively," A-1 Fire Protection, Inc., 233 N.L.R.B. 38, 39 (1977), it did not make any finding as to the actual practice by which work was solicited for, or assigned to, CAS and A-1. In particular, it did not analyze, one way or the other, the evidence in the record that, prior to 1975, A-1 was only engaged in "small" installation jobs.[20] The Board concluded that "any increase in A-1's work and decrease in CAS's ... must be considered the result of changes in the demand for contracts to be performed under union conditions," id. at 40, and that A-1's inability to perform union work rendered the ALJ's transfer-of-work finding "untenable," id. but these conclusions were drawn from a syllogism whose major premise was radically incomplete. We therefore cannot find that the Board directly confronted the ALJ's conclusion, based in part on credibility determinations left undisturbed by the Board, that Corcoran did indeed disturb the status quo that had existed between CAS and A-1 by "chang(ing) work arrangements" so as to divert work from CAS to A-1 that CAS would otherwise have performed.[21]
 
 
 21
 One final point deserves to be made. The Board suggests that, if the legitimacy of a given double-breasted operation is conceded, the employer should be free to utilize the two sides of the enterprise as is most economically advantageous to him. 233 N.L.R.B. at 40. It has long been held, however, that an employer may not shift work away from a bargaining unit simply because it is to his economic advantage. See Fibreboard Paper Products Corp. v. NLRB, supra, 379 U.S. at 208, 213-14, 85 S.Ct. at 401, 404-05. The fact that there is a group of employees legitimately outside the bargaining unit does not change the employer's duty with regard to the employees in the bargaining unit. A-1 is free both to function and to prosper as a nonunion company as long as its activity is not the result of an illegal transfer of work from CAS.
 
 V. CONCLUSION
 
 22
 This case involves a small employer and a handful of workers. We are therefore especially reluctant to burden both the employer and the union with further proceedings. The Board appears, however, to have altered the law in a manner that could significantly affect future cases without yet articulating a coherent explanation amenable to meaningful review. We are therefore constrained to remand the case for further consideration by the Board. The Board should determine whether Corcoran engaged in conduct that deprived CAS of work which, in light of Corcoran's past practice, CAS would otherwise have been expected to perform. If the Board finds that Corcoran did engage in such conduct, it should either apply the "clear and unmistakable" standard to test whether the union agreed to that conduct, or explain why a different standard is appropriate. If it concludes that there was an unwaived denial of the union's statutory rights, it should devise an appropriate remedy, which may, if warranted, include extension of the CAS collective bargaining agreement to employees of A-1.
 
 
 23
 Remanded.
 
 MacKINNON, Circuit Judge (dissenting):
 
 24
 In my opinion the decision and order of the National Labor Relations Board should be affirmed. When this case was here the first time, the court remanded the case to the Board because of what it considered was the Board's failure to apply the "clear and unmistakable" waiver standard to determine whether a union had forfeited its rights under section 8(a)(5) of the National Labor Relations Act. The point proved baseless. However, undaunted by its previous failure, the court now orders a second remand to determine "whether Corcoran engaged in conduct that deprived CAS of work which, in light of past practice, it would otherwise have been expected to perform." Maj. op. at 834. The basic claim is that "Corcoran unilaterally transferred work from CAS to A-1 without fulfilling his statutory duty to bargain." Id. at 832. Otherwise stated, this will be a remand to determine if Corcoran transferred work away from CAS, i.e., "shift(ed) work away from a bargaining unit simply because it is to his economic advantage" to do so. Id. at 834.
 
 
 25
 In response to this point, however, the Board in its decision has already found as a fact that CAS and A-1 did not engage "in deception or that they transferred work away from their union-represented employees to their nonunion employees." A-482 (emphasis added). Again at A-481 the Board finds, "there is no evidence that jobs bid for and performed by CAS were transferred to A-1," or that A-1 was doing any work that required union labor. Thus, the Board has already found the facts to be determined on remand. The panel's remand thus recognizes that the Board's decision was proper on the facts before it, but orders it to see if it can dig up more facts (not present in the existing record) that might cause it to alter its decision. Such post hoc fact finding is not proper. The case should be decided here on the record made in the Board proceedings.
 
 
 26
 The real dispute between the parties, as the court points out, Maj. op. at 830, was over "the scope of the bargaining unit" covered by the collective bargaining agreement which had been entered into by the parties. A-485. In this regard, the Board states in its opinion on remand that
 
 
 27
 The crucial distinction (between this case and one calling for application of the "clear and unmistakable waiver" standard), however, is that, in the circumstances of this case, the Union did not have a statutory right to represent the employees of A-1 and thus had no right which could have been waived, clearly and unmistakably, or otherwise.
 
 
 28
 Id. (emphasis added). The Board rightly holds that nothing in the Act grants the union a right to alter or to enlarge the CAS bargaining unit which was agreed to at the time of the original contract in 1973. In 1975 the parties negotiated and executed a new collective bargaining agreement, and it is unquestioned that the union at that time had full knowledge of the fact that CAS was organized to perform union contracts and that A-1 was organized to perform nonunion work and was performing such work-at times with union labor. The collective bargaining agreement thus constituted an agreement by the parties on the scope of the unit covered by the contract and the Board properly refused to allow the union to avoid the terms of that agreement, voluntarily entered into with full knowledge on the part of the union, by asserting an unfair labor practice because of respondent's refusal to enlarge the unit to include A-1's employees.
 
 
 29
 It is contended that the union did not know the type of double-breasted operation it was getting. This is belied by the record. In January 1975-before the 1975 agreement was executed-when Corcoran told the Union representative that he was forced to lay off CAS employees, he also informed the union's representative that he could hire them to work on A-1 jobs. The union representative assented "grudgingly." Thereafter Corcoran in fact employed several CAS employees to work for A-1, paying them union wages but not union benefits. Five months later in May 1975 Corcoran voluntarily entered into the second collective bargaining agreement with the union covering the CAS employees. At that time the union did not request that the contract cover A-1 or its employees. In fact, during the negotiations there was no discussion concerning extending the coverage to include A-1-though the circumstances of A-1's operations were well known to the union. Then, six months later, in November 1975 the union demanded that the employees of both companies "be treated as a single bargaining unit and that the 1975 contract be applied to A-1." A-477. This demand smacks of sharp practice.
 
 
 30
 The finding that there was no deception, which the panel views as irrelevant to the question this case presents, was not something that was interjected by the Board. Rather, it was offered in response to the General Counsel's contention that the case was controlled by Don Burgess Construction Corporation d/b/a Burgess Construction and Donald Burgess and Verlon Hendrix d/b/a V & B Builders, 227 NLRB 765 (1977), enforced, 596 F.2d 378 (9th Cir. 1979). Burgess Construction involved situations in which employers through deception and misrepresentation had used related companies to evade their obligations under a collective bargaining agreement. So the opinion of the Board with regard to deception merely disposes of the argument of the General Counsel and turns it to its advantage.
 
 
 31
 The issue of fact the panel would now remand to the Board for determination has already been resolved by the Board: no CAS work was transferred from it to A-1. I would accordingly conclude that Corcoran did not engage in an unfair labor practice either by withdrawing work from CAS or by refusing to enlarge this voluntarily agreed-upon bargaining unit to include employees who were known to exist and who were not intended by the parties to the bargaining agreement to be included therein. The fact that this was a pre-hire agreement in the first place is a strong additional reason for not expanding the contract to cover workmen that clearly were not included. The union should not be allowed to avoid the terms and limitations of that agreement and deny the nonunion employees their right to vote on whether they wish to be covered by the collective bargaining agreement. In my view the decision of the National Labor Relations Board should be affirmed.
 
 
 
 [1]
 600 F.2d 918 (D.C.Cir.1979)
 
 
 [2]
 Section 8(a)(5), 29 U.S.C. § 158(a)(5), provides that "(i)t shall be an unfair labor practice for an employer ... to refuse to bargain collectively with the representatives of his employees ...."
 
 
 [3]
 600 F.2d at 919-21
 
 
 [4]
 For example, Corcoran testified that both CAS and A-1 sent out postcards soliciting installation work. The CAS postcards, however, were sent to architects, Joint Appendix (J.A.) at 194, while the A-1 postcards were apparently only sent to individual business and residential customers, see J.A. at 235. Moreover, while CAS had a block ad in the 1974 "Yellow Pages" under the heading "Sprinklers-Automatic-Fire," in the company of ads from other installation contractors, and only a basic listing under the heading "Fire Protection Equipment Repairing and Servicing," A-1 had only a basic listing under "Sprinklers-Automatic-Fire" and a block ad under "Fire Protection Equipment Repairing & Servicing." J.A. at 398-99. The record also contains a November 14, 1975 letter from Corcoran to the union business manager in which Corcoran states that A-1 was formed to "sell fire extinguishers, smoke detectors, alarms, kitchen hood system(s), inspections of sprinkler system(s), and the small jobs that were being done by other compan(ies) other than Sprinkler Compan(ies). Such as plumber(s), General Contractors, and Sprinkler fitters, that moon light after work for (their) friends, and get (paid) cash for it." J.A. at 350
 
 
 [5]
 There is evidence, however, that the new union business manager who signed the contract on behalf of the union believed that A-1 was only engaged in work other than installation. See J.A. at 156; A-1 Fire Protection, Inc., 233 N.L.R.B. 38, 42 (1977) (ALJ's decision)
 
 
 [6]
 See 233 N.L.R.B. at 43-44 (ALJ's decision)
 
 
 [7]
 See J.A. at 114
 Corcoran is also reported to have said that he was "starting his nonunion company" because the union business agent had been "harassing" him, J.A. at 115, and that though there were jobs he could get on behalf of CAS, he would get them for A-1 instead, J.A. at 164. In one instance, a customer called Corcoran to get a bid on behalf of CAS. Corcoran gave him a bid, but then called back an hour later with an unsolicited lower bid on behalf of A-1. See J.A. at 95-97.
 It appears that, since the original hearing in 1976, CAS has totally discontinued operations. See note 10 infra.
 
 
 [8]
 The ALJ also found that, in one specific instance, Corcoran had violated §§ 8(a)(3) and 8(a)(4) of the Act by withdrawing an already-assigned job from CAS after learning that the union had filed a charge of unfair labor practices. This conclusion was affirmed by the Board and by this court on review. See 600 F.2d at 923
 
 
 [9]
 The Board did not, however, overrule the Administrative Law Judge with respect to the credibility of any witnesses. See 233 N.L.R.B. at 38 n.1
 
 
 [10]
 The Board also relied on the absence of evidence that the CAS bargaining unit had ceased to exist as a "viable bargaining unit." 233 N.L.R.B. at 39. During the proceedings on remand, the union moved to reopen the record in order for it to submit evidence that, since the original hearing in August 1976, CAS's operations had been completely discontinued and the CAS bargaining unit had ceased to exist. See J.A. at 444-48. The Board held the union's motion to be untimely. A-1 Fire Protection, Inc., 250 N.L.R.B. 217, 217 n.3 (1980). In light of our other holdings, we do not reach the union's claim that denial of the motion to reopen constituted an abuse of discretion. See note 21 infra. The Board is, of course, free to decide in the first instance whether anything in our present opinion should cause it to allow the record to be reopened
 
 
 [11]
 Chairman Fanning dissented. He agreed with the majority that the "clear and unmistakable" waiver test was inapplicable in this case, but argued that the evidence indicated that Corcoran did engage, without the consent of the union, in practices that favored A-1 at CAS's expense. 250 N.L.R.B. at 221-22
 
 
 [12]
 See Appellant's Reply Brief at 11; cf. Appellant's Opening Brief at 25
 
 
 [13]
 For example, in distinguishing Don Burgess Construction Corp., 227 N.L.R.B. 765 (1977), enf'd, 596 F.2d 378 (9th Cir.), cert. denied, 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979), and similar cases, the Board characterizes those cases as involving the extension of a union contract in order to "preserve the recognized bargaining unit and the previously established right of the employees therein to be represented" and as arising out of improper transfers of work. 250 N.L.R.B. at 219
 
 
 [14]
 The more difficult question is whether, in the absence of a pattern of established practice, a breach of contract may in itself constitute a change in the terms and conditions of employment. See Papercraft Corp., 212 N.L.R.B. 240, 241 n.3, 250 (1974)
 
 
 [15]
 See 600 F.2d at 921-22
 
 
 [16]
 This formulation is subject to two important caveats, neither of which seems to apply in this case. First, an employer's duty to bargain over decisions that involve the core of his entrepreneurial control and fundamentally change the nature of his operations remains unsettled. See Davis v. NLRB, 617 F.2d 1264, 1267-70 (7th Cir. 1980). Second, an employer need not bargain over transfers of work that do not affect the compensation or job security of bargaining unit employees. See NLRB v. King Radio Corp., 416 F.2d 569, 571-72 (10th Cir. 1969), cert. denied, 397 U.S. 1007, 90 S.Ct. 1234, 25 L.Ed.2d 420 (1970); Office & Professional Employees International Union, Local 425 v. NLRB, 419 F.2d 314, 321 (D.C.Cir.1969)
 
 
 [17]
 Cf. 250 N.L.R.B. at 222 (Chairman Fanning, dissenting from Board's supplemental opinion) (arguing that Local 669 "may have consented to a double-breasted operation, but ... certainly did not consent to the one it got")
 
 
 [18]
 600 F.2d at 923 n.8
 
 
 [19]
 The Board's supplemental opinion may also be read to rely on a finding that Corcoran did not, except in the one instance in which violations of §§ 8(a)(3) and 8(a)(4) were found, see note 8 supra, withdraw from CAS work actually in hand. See 250 N.L.R.B. at 219. If the Board did have such reasoning in mind, we must agree with Chairman Fanning that the standard for an unfair labor practice cannot be so narrow. 250 N.L.R.B. at 221-22 (Chairman Fanning, dissenting.) The terms and conditions of employment can be changed as easily by the failure to assign a given item of work as by the reallocation of already-assigned work. Cf. Office and Professional Employees International Union, Local 425 v. NLRB, supra, at 321. A rule as narrow as the one the Board may be suggesting would be equivalent to holding, in cases concerning an employer's discontinuing to give his employees Christmas turkeys, see 5 T. Kheel, Labor Law § 19.04 (1982), that the employer would only be violating the statute if he repossessed turkeys already in hand
 
 
 [20]
 See p. 3 & n.4 supra
 
 
 [21]
 We also do not think that the Board's reliance in its original opinion on the absence, at that time, of evidence that the CAS bargaining unit had ceased to exist as a "viable bargaining unit," see note 10 supra, is consistent with precedent. See pp. 831-832 supra; Office & Professional Employees International Union, Local 425 v. NLRB, 419 F.2d 314, 321 (D.C.Cir.1969); International Union, UAW v. NLRB, 381 F.2d 265, 266 (D.C.Cir.), cert. denied, 389 U.S. 857, 88 S.Ct. 82, 19 L.Ed.2d 122 (1967)